No. 12393

IN THE SUPREME COURT OF THE STATE OF MONTANA

1973

---

EDGAR G. BROWN and JOSEPHINE I. BROWN,
husband and wife,

Plaintiffs and Respondents,

-vs-

CLAUDE D. CARTWRIGHT et al.,

Defendants and Appellants.

---

Appeal from:   District Court of the Fifth Judicial District,
Honorable Frank E. Blair, Judge presiding.

Counsel of Record:

For Appellants:

Patrick F. Hooks argued, Townsend, Montana
Thomas F. Dowling argued, Helena, Montana

For Respondents:

Church, Harris, Johnson & Williams, Great Falls,
Montana
Earl J. Hanson argued, Great Falls, Montana

---

Submitted:   September 24, 1973

Decided: NOV 7 - 1973

Filed: NOV 7 - 1973

Thomas J. Kearney

Clerk

Mr. Justice Wesley Castles delivered the Opinion of the Court.

This is an appeal from a judgment entered upon findings of fact and conclusions of law made by the court sitting without a jury. Plaintiffs Brown, husband and wife, brought an action to quiet title to certain ranch property in Jefferson County. Defendants Cartwright, husband and wife, filed a counterclaim to quiet title to the land in themselves; and defendants Swain, husband and wife, crossclaimed against defendants Cartwright for breach of warranty title. Trial was had in the district court in Jefferson County. The trial judge made findings of fact and conclusions of law and filed an opinion in favor of plaintiffs and against all defendants. Defendants Swain were awarded money damages by virtue of their crossclaim against defendants Cartwright for breach of warranty of title. Judgment was entered for plaintiffs and all defendants appeal.

Hereafter in this opinion, the parties will be referred to in the singular.

The action involves a tract of land containing 8.8 acres. This 8.8 acre tract was a part of a larger pasture area constituting about 700 acres. Prior to 1961, Brown was the record owner of the 700 acres which was under fence and used as pasture land. The 8.8 acre tract had a fence, at that time, along the easterly edge on the railroad right-of-way and a fence along the north section line. The tract is a triangular piece measuring 657' along the section line east and west, 1057' along the quarter section line north and south, and bounded on the easterly and southerly side by the railroad right-of-way. There was a gate on the railroad fence and a railroad crossing which afforded access to Brown in going to and from the 700 acre pasture with his cattle. There was also a gate on the north fence which afforded access to land in the adjoining section owned by Winslows.

A few years prior to 1961, Cartwright bought a neighboring ranch from one Herbert Marks. The basis of the controversy began

when the estate of Alfred I. Marks was probated and the adminis-
trator incorrectly included the 8.8 acre tract in the inventory
and appraisement and deeded the tract to Cartwright through an
administrator's deed.

As to this transaction, the trial court described it in its
"Basis of Decision and Opinion" in this way:

> "The Estate of Alfred I. Marks had no interest in the
> land involved here. When it attempted to take it into
> the Inventory, the attempt was a nullity. When it
> tried to distribute this property described as TRACT
> #1, exhibit 2, for plaintiff and as the property des-
> cribed as defendants' exhibit A, the nullity was com-
> pounded and then when later an attempt to sell the
> same property to the Cartwrights by deed dated June 16,
> 1954, the nullity was still further compounded, a
> veritable comedy of errors, but without any legal
> effect upon the property we are talking about in this
> action; the record title of which was in the plaintiffs
> at all of those times."

In 1961, Cartwright purchased the Winslow ranch immediately
north of the 8.8 acre tract. After buying the Winslow ranch,
Cartwright continuously drove cattle across the 8.8 acre tract
entering from the railroad gate and then through the gate on
the north section line. At the time there was no fence between
the 8.8 acre tract and the balance of the 700 acre pasture to
the west.

Also in 1961, Cartwright was approached by a right-of-way
agent for Montana Power Company who wanted to procure an easement
for a natural gas transmission line across the 8.8 acre tract.
Cartwright first told him to double check the title to be sure
it was Cartwright ground. The Montana Power agent came back later
and told Cartwright that he was the legal owner, although Brown
had tried to claim title. Cartwright then executed an easement,
received $800, and the Montana Power Company built its gas line.
Significantly, Brown not only knew of the Cartwright easement
to the Power Company, but watched them build the line across the
tract; he could "see them from the house."

Brown testified that in 1961--after the Cartwright-Power
Company easement-- he went to the Jefferson County Assessor to
check the assessment list. He was told the tract was assessed

to Cartwright. Brown took no steps to change the assessment and the evidence is uncontroverted that Brown did not pay any taxes on the 8.8 acre tract from 1961 until 1971--after the lawsuit was filed. The record is likewise clear that Cartwright did pay the taxes from before 1961 to 1968, when the property was sold to Swain under a contract requiring Swain to make tax payments.

Both Brown and Cartwright testified to a conversation between them in either 1961 or 1962. Both agreed that Cartwright offered to sell Brown the 8.8 acre tract for $800. Brown wanted to buy it at that price and the only conflict in the testimony is as to why the deal fell through. The trial judge asked Brown why he wanted to buy his own property and elicited this response:

"THE COURT: Yes, sustained. Why were you trying to buy your own property from this man is what he's asking you really.

"A. I don't know how to answer the question. We had thought it was ours, and then when Montana Power went through the area they said that it belonged to Claude Cartwright and they had paid him the easement for the right of way through the property. I checked the Assessor's office to see who it was assessed with and they had assessed it to Claude Cartwright."

From 1961 to 1966, Cartwright continued to use the 8.8 acre tract in going to and from the Winslow place. On occasion he left the Winslow gate open so his cattle could graze and water. Brown admitted he saw Cartwright stock on the tract and the gate open. During this same time, Brown had access to the tract in the absence of a fence along the west boundary. Cartwright testified he made no objection because he knew Brown could not keep cattle off without a fence and he did not turn his cattle in because they would "have been on Brown". According to Cartwright, a director of the Bozeman Production Credit Association for some twenty years, the 8.8 acre tract would only graze one cow.

In 1964, Cartwright hired a Mr. Bandy to survey the west boundary of the 8.8 acre tract. Bandy did not complete the job and another surveyor, Mr. Erickson, completed it in 1966. That fall--1966--Cartwright hired Bud Swann to build a fence along the west boundary. Cartwright went up to tell Brown about it and

to be sure that the location of the gate--to allow Brown access to his acreage--met Brown's approval. Both Brown and Swann testified that Brown came down during fencing and made no objection to anyone. After fencing in October 1966, Cartwright occupied the tract exclusively. However, Cartwright recognized then, and does now recognize, the right of Brown to go across the tract for access to Brown's pasture.

In August 1967, Cartwright sold the 8.8 acre tract to Swain under a standard contract for deed. That same fall Swain widened the road into the premises, dug a basement and then moved a house onto the tract. A picture of the house, which is now the Swain family home, was received in evidence as Exhibit D. Brown admitted he observed these improvements being made and made no objection to anyone.

Then, in July 1970, nine years after the Montana Power easement and three years after the Swain house, Brown retained an attorney who made a title search and Brown made his first objection to the Cartwright title. In July 1970, Brown's attorney gave notice to defendants Cartwright and Swain to vacate the premises. The complaint was filed September 18, 1970, some three years and ten months after Cartwright cut off Brown's use by fencing the tract.

Brown's complaint sounds in two counts. In the first count, he alleges that he is, and for twenty years last past, has been the owner of the 8.8 acre tract, is entitled to possession thereof, and seeks a decree quieting title to the premises. In the second count, Brown alleges that after October 1966, defendants "wilfully and forcefully" trespassed upon the premises. He alleges that as a result of this trespass he has been deprived of the use of the 8.8 acre tract for both grazing and passage. He seeks damages under the second count for $5,000 as and for damage to the remainder of the ranch; and the sum of $2,000 as and for the reasonable value of the use of the 8.8 acre tract during the period defendants occupied it, and for the further sum of $2,000 as Brown's costs of recovering possession of the property.

In answer to Brown's first count (quiet title), Cartwright denied the material allegations of the complaint. Additionally, Cartwright alleged as a third defense that Brown was not possessed or seized of the 8.8 acre tract within five years prior to the filing of the complaint and the action is barred by sections 93-2504 and 93-2505, R.C.M. 1947. As a fourth defense Cartwright alleged that Brown has been guilty of such laches and unreasonable delays as to estop and preclude him from prevailing on the first count.

In answer to the second count, Cartwright denied the material allegations of trespass and set up the affirmative defenses of laches and the statute of limitations, section 93-2607, R.C.M. 1947. Finally, Cartwright asserted a counterclaim for quiet title to the 8.8 acre tract in his name, subject to the rights of Swain under the contract.

Brown's reply generally denied the counterclaim.

Swain's answer generally denied the material allegations of the Brown complaint. Then, as an "affirmative defense" Swain alleged that he entered into the Cartwright contract in good faith and alleged:

> "* * * should the Court find that the [Cartwrights] are not the owners * * * [Swains] should be entitled to recover all sums of money paid under this contract together with damages which they suffer as a result of this action, together with costs, interest and attorney fees."

The trial court made no findings on the Brown trespass claim. In its opinion the trial court held that Brown had failed to prove the amount of damages, and therefore, no recovery could be had. Brown has not filed a cross appeal so the trespass action is out of the lawsuit.

The determinative issue on appeal is whether Brown lost legal title to Cartwright by adverse possession or, more specifically here, who had possession of the 8.8 acre tract for the five years immediately preceding September 18, 1970?

- 6 -

In order to obtain legal title under the doctrine of adverse possession, Cartwright must prove that he possessed and occupied the land pursuant to the requirements of sections 93-2508 and 93-2509, R.C.M. 1947, which provide:

> "93-2508. Occupation under written instrument or judgment - when deemed adverse. When it appears that the occupant, or those under whom he claims, entered into the possession of the property, under claim of title, exclusive of other right, founding such claim upon a written instrument, as being a conveyance of the property in question, or upon the decree or judgment of a competent court, and that there has been a continued occupation and possession of the property included in such instrument, decree, or judgment, or of some part of the property, under such claim, for five (5) years, the property so included is deemed to have been held adversely, except that when it consists of a tract divided into lots, the possession of one (1) lot is not deemed a possession of any other lot of the same tract."

> "93-2509. What constitutes adverse possession under written instrument or judgment. For the purpose of constituting an adverse possession by any person claiming a title founded upon a written instrument, or a judgment or decree, land is deemed to have been possessed and occupied in the following cases:

> "1. Where it has been usually cultivated or improved.

> "2. Where it has been protected by a substantial inclosure.

> "3. Where, although not inclosed, it has been used for the supply of fuel, or of fencing timber, either for the purpose of husbandry, or for pasturage, or for the ordinary use of the occupant.

> "4. Where a known farm or a single lot has been partly improved, the portion of such farm or lot that has been left not cleared or not inclosed, according to the usual course and custom of the adjoining country, shall be deemed to have been occupied for the same length of time as the part improved and cultivated."

The term "claim of title" as used in section 93-2508, was discussed in Sullivan v. Neel, 105 Mont. 253, 257, 73 P.2d 206, as:

> "The phrase 'claim of title' as used in the foregoing section of the statute is synonymous with that of 'color of title.' (Morrison v. Linn, 50 Mont. 396, 147 Pac. 166; Fitschen Bros. Com.Co. v. Noyes' Estate, 76 Mont. 175, 246 Pac. 773.)

"It is argued that the quitclaim deeds were insufficient to vest in the plaintiff a color of title within the meaning of the statute. The second deed correctly described the entire tract of land, and the first deed correctly described one-half of the area. Color of title does not depend upon the validity or effect of the instrument, but entirely upon its intent and meaning. (Fitschen Bros. Com.Co. v. Noyes' Estate, supra.)

"In the case of Morrison v. Linn, above cited, this court quoted with approval the definition of 'color of title' from the case of Beverly v. Burke, 9 Ga. 440, 54 Am.Dec. 351, reading as follows: 'What is meant by color of title? It may be defined to be a writing, upon its face professing to pass title, but which does not do it, either from a want of title in the person making it, or from the defective conveyance that is used - a title that is imperfect, but not so obviously so that it would be apparent to one not skilled in the law.' And in the case of Fitschen Bros. Com. Co. v. Noyes' Estate this court said: 'And color of title is that which is title in appearance, but not in reality. As a basis of claim by adverse possession, color of title may be shown by any instrument purporting to convey the land or the right to its possession, provided claim is made thereunder in good faith.'

"These statements are in accord with the current authority generally." (Emphasis supplied.)

Here, Cartwright, a rancher and not a lawyer, received two deeds in his chain of title, which purported to convey land west of the railroad tract. Cartwright testified that he had two attorneys review his title and they apparently failed to note the discrepancy in the two Marks deeds. From the evidence, it is clear that the error or erroneous description not only fooled Cartwright, a layman, but also misled the right-of-way department for the Montana Power Company and the County Assessor of Jefferson County. Under these circumstances, when an occupant is paying taxes on a tract of land and when a public utility pays him $800 for an underground pipeline easement across that tract, the occupancy is under claim or color of title within the meaning of the statute.

Section 93-2513, R.C.M. 1947, applicable to any claim of adverse possession, provides:

"Occupancy and payment of taxes necessary to prove
adverse possession. In no case shall adverse posses-
sions be considered established under the provisions
of any section or sections of this code unless it shall
be shown that the land has been occupied and claimed
for a period of five (5) years continuously, and the
party or persons, their predecessors and grantors, have,
during such period,paid all the taxes, state, county,
or municipal, which have been legally levied and assessed
upon said land." (Emphasis supplied).

Applying this statute, it is apparent that there are two
time spans involved. First, there is the period from October
1966 (completion of the fence) until the filing of the complaint
(September 18, 1970). Second, there is the period from 1961
until October 1966.

Dealing first with the period of time, October 1966 to
September 1970, there can be no question raised as to the actual,
exclusive and notorious possession of the tract by Cartwright
and Swain after the fence was completed - a period of three years
and ten months before the filing of the complaint.

Before discussing the evidence as to the period before
completion of the fence in October 1966, we note what this and
other courts have said in construing the nature and type of posses-
sion required. It is clear that the type, nature and character
of the land involved must be considered. In Sullivan at p. 259,
this Court held:

"Thus, it will be observed that the foundation of
the claim of plaintiff and the character of the land
in question determine the degree and character of
possession or occupancy necessary to satisfy the
statutes." (Emphasis supplied.)

In 3 Am.Jur.2d Adverse Possession § 14, p. 94, it is said:

"* * * The rule of actual possession is to be applied
reasonably in view of the location and character of
the land claimed. It is sufficient, if the acts of
ownership are of such a character as to openly and
publicly indicate an assumed control or use such as
is consistent with the character of the premises in
question. * * *" (Emphasis supplied.)

From 1961 until October 1966, the 8.8 acre tract did not have
a west fence and immediately adjoined the 692 or so acres Brown
used as his pasturage. The 8.8 acre tract would only graze one
cow. Obviously, as Cartwright testified, he could not put a cow

- 9 -

or cows on the tract for he well knew, as an experienced cattle-
man, that his animals would trespass on Brown. Likewise, Cart-
wright was obviously well aware of his obligation to "fence out",
for he had Mr. Bandy on the property to survey the fence line as
early as 1964.

In Magelssen v. Atwell, 152 Mont. 409, 414, 451 P.2d 103,
this Court pointed out that the question of adverse possession or
occupancy is one of the intention of the parties:

> "The law of this state is that: 'The question of
> adverse possession is one of intention. The
> intention must be discovered from all the circum-
> stances of the case.' Lamme v. Dodson, 4 Mont.
> 560, 591, 2 P. 298, 303 (1883); Stetson v. Young-
> quist, 76 Mont. 600, 248 P. 196, 198 (1926)."

3 Am.Jur.2d Adverse Possession §13, p. 91, puts the rule
in a slightly different fashion:

> "* * * While there is no fixed rule whereby the actual
> possession of real property by an adverse claimant may
> be determined in all cases, it may be stated as a
> general rule that the claimant's possession must be such
> as to indicate his exclusive ownership of the property.
> Not only must this possession be without subserviency
> to, or recognition of, the title of the true owner, but
> it must be hostile thereto, and to the whole world.
> It has been declared that the disseisor 'must unfurl
> his flag on the land, and keep it flying, so that the
> owner may see, if he will, that an enemy has invaded
> his domains, and planted the standard of conquest.'"
> (Emphasis supplied.)

Did Cartwright intent to claim and occupy the 8.8 acre tract
prior to October 1966? It is difficult to imagine any act indi-
cating that intent more clearly than acceptance of consideration
from the Montana Power Company for the granting of the easement,
particularly when Cartwright was advised that Brown claimed some
title to the tract. However, if there was any doubt, Cartwright
then put the question of intent beyond argument when he went to
Brown and offered to sell him the very tract here involved. Brown
did not dispute that obvious claim of ownership for he admitted
that he offered to buy it. The "flag of conquest" was not only
flying high over the 8.8 acre tract, but was also firmly implanted
at Brown's barn door where this conversation took place.

- 10 -

Following the negotiations in 1961 or 1962, Cartwright continued his use of the 8.8 acre tract in getting to and from the Winslow place, and it is uncontradicted that he employed Bandy to start the survey in 1964, which was finally completed in 1966. The only claim of possession during the period from 1961 to 1966 that Brown can possibly advance is that of pasturage by his cattle in the absence of a fence.

Brown's argument that he was grazing the 8.8 acre tract as a matter of right from 1961 until 1966 collapses when one considers his testimony that he was still waiting for Cartwright to give him a deed to the tract. Additionally, if that were Brown's intent at that time, why did he remain silent when he visited the premises, at Cartwright's suggestion, to observe Bud Swann erect the fence which would end his grazing privileges on the tract. If Brown did indeed claim ownership and right of possession of the 8.8 acre tract prior to the fencing, why did he, with full knowledge of the assessment situation in Jefferson County, allow Cartwright to pay the taxes on the tract in 1961 through 1966? There can be only one answer: Brown knew that Cartwright claimed ownership of the tract and Brown, in his own mind, thought Cartwright owned it. The only thing that Brown did with respect to the 8.8 acre tract was to turn his cattle out on his own 700 acre pasture, and let them graze on the tract if they so desired.

The trial court failed to give any consideration to the nature or character of the tract of land here in question or the multiple acts and statements of the parties which evidenced the clear intention of Cartwright to claim possession and ownership of this tract from 1961 to 1966. The trial court abused its discretion in entering findings rejecting the defense of the statute of limitations, denying Cartwright's counterclaim and entering judgment which is not supported by any substantial evidence.

As to the payment of taxes, it is admitted that Cartwright paid all of the real property taxes levied and assessed against this 8.8 acre tract for the years 1954 through 1967, a period of

fourteen years. During seven of these years, 1961 through 1967, Brown had personal knowledge that the tract was being assessed to Cartwright. Under the contract for deed between Cartwright and Swain, August 9, 1967, Swain was obligated to pay the real property taxes for the year 1968, and succeeding years while the contract remained in force and effect. Swain breached his contract by failing to pay the taxes levied and assessed for the years 1968 and 1969. The tax notices for these years, received in evidence over objection, show that the property was assessed to Cartwright "in care of" Mr. and Mrs. Swain. This lawsuit was commenced on September 18, 1970, before any taxes were due and payable for that year.

More than four months after the commencement of this lawsuit, on January 29, 1971, Mrs. Brown went to the county treasurer of Jefferson County and paid the taxes for the years 1968, 1969 and 1970, which Swain had allowed to go delinquent. Mrs. Brown testified that she paid the taxes on the advice of one of their attorneys in this litigation. In November 1971, Mrs. Brown went in and paid the taxes, assessed against Cartwright and Swain, for that year.

All of the Brown testimony as to the payment of the taxes, as well as the tax receipts, was admitted by the trial judge over repeated objections of all defendants. While the trial court indicated the objections were being overruled "pro forma", the presiding judge did indicate that he would study the matter further. However Finding of Fact II taken with the general findings and conclusions and opinion, indicates the trial judge considered the evidence of these payments and at least inferentially found that Cartwright and Swain had not complied with section 93-2513, R.C.M. 1947, with respect to the obligation to pay the taxes.

While this Court has never passed on this precise question, the Court has clearly held that the filing of a quiet title action freezes the respective rights of the parties at the time of commencement of the action. In Flathead Lumber Corp. v. Everett, 127 Mont.

291, 295, 263 P.2d 376, this Court was presented with the reverse of the situation here. In Flathead Lumber Corp., defendant sought to utilize the time between the filing of the action and the trial as possession time for computation of the statutory period of adverse possession. The Court flatly rejected this contention:

> "The rule is that the bringing of an action against one in adverse possession disputing his title arrests the running of the statute. [Citing cases]
>
> "During the pendency of the action defendants can acquire no new right as against plaintiffs by the mere fact that they remain in possession. [Citing cases]." (Emphasis supplied.)

The statute, section 93-2513, R.C.M. 1947, merely states that the adverse possessor must have occupied and claimed the land for a period of five years continuously and "during such period, paid all taxes * * * which have been legally levied and assessed upon said land." Cartwright complied with that statute, even without regard to the "after the fact" payments.

Having found that the evidence does not uphold the trial court's findings of fact on adverse possession, defendant's contentions on laches need not be discussed. We do comment though that for nine years plaintiff not only stood by with full knowledge of Cartwright's claim of ownership and aggressive acts of possession, but even discussed purchasing the property.

The findings, conclusions and judgment of the trial court are reversed and the cause remanded with directions to enter judgment for Cartwright. The judgment in favor of Swain against Cartwright is likewise reversed.

----------------------------------------
Justice

- 13 -

We Concur:

_____
Chief Justice

_____

_____
Justices


_____
Hon. M. James Sorte, District
Judge, sitting for Justice John
Conway Harrison.

- 14 -