No. 80-208

IN THE SUPREME COURT OF THE STATE OF MONTANA

1981

J. O. BLASDEL and ETHEL BLASDEL,

Plaintiffs and Respondents,

vs.

THE MONTANA POWER COMPANY, a
corporation,

Defendant and Appellant.

Appeal from: District Court of the Eleventh Judicial District,
In and for the County of Flathead
Honorable Robert C. Sykes, Judge presiding.

Counsel of Record:

For Appellant:

Warden, Christiansen & Johnson, Kalispell, Montana
Merritt N. Warden argued, Kalispell, Montana

For Respondents:

McGarvey, Lence & Heberling, Kalispell, Montana
Jon L. Heberling argued, Kalispell, Montana

Submitted: October 21, 1981

Decided: FEB 2 1982

Filed: FEB 3 - 1982

Thomas J. Kearney
Clerk

Mr. Justice John Conway Harrison delivered the Opinion of the Court.

In this inverse condemnation action the defendant, Montana Power Company, appeals from a judgment in favor of the plaintiffs landowners.

Plaintiffs-respondents, the Blasdels, filed suit on December 1, 1960, against the Montana Power Company for inverse condemnation of the Blasdel farm. Blasdels claim that Montana Power Company's construction and operation of the Kerr Dam on Flathead Lake caused the water table to rise and severely damage their farm.

Montana's Eleventh Judicial District Court, in and for the County of Flathead, bifurcated the issues. In February 1979, a two-week nonjury trial found liability and a taking without just compensation. In November 1979, a two-week jury trial established damages as follows:

| $ 84,652.56 | jury verdict |
| $116,355.82 | interest |
| $115,448.64 | litigation expenses* |
| $316,457.02 | Total Judgment |

Plus 10% interest from 12/10/79
*Awarded after a one-day nonjury trial

On appeal, Montana Power claims the cause is barred by prescription and the statute of limitations. It also challenges certain findings of fact, conclusions of law, admission of certain exhibits, and attorney fees and costs awarded to the plaintiffs.

In 1930 the Federal Power Commission issued a license to the predecessor of the Montana Power Company to build Kerr Dam located just off the south end of Flathead Lake. That dam was completed in 1939, and in 1940 the appellant, Montana Power Company, began to operate Kerr Dam. Prior to the construction of the dam, the water level in Flathead

-2-

Lake remained at 2883 feet above sea level (FASL), except during two months of high water each spring. After the dam was constructed in 1939, the water level of Flathead Lake remained at 2893 FASL for a period of five months each year (May through September) and averaged 5.4 feet higher than the predam level.

The respondents, J. O. and Ethel Blasdel, first began operating the farmland in question in 1928 as tenants. They purchased the area involved at three different times. The first purchase was made in January 1942, the second in December 1945, and the third in 1957.

The Blasdel farm is located one and one-half miles north of Flathead Lake, one-half mile from the Flathead River, and one-fourth mile from a slough that is connected to the Flathead River. The farm is surrounded on three sides by water--to the north and to the east by the Flathead River, and to the south by Flathead Lake. The southbound Flathead River makes a large turn above the Blasdel farm and turns east and parallel to the northern border of the farm. The river then turns south and runs parallel to the eastern border of the farm. This entire area of the river remains at the same level as Flathead Lake. Therefore, the Blasdel farm is surrounded by water that now averages 5.4 feet higher than the level of the predam years.

Prior to the construction of Kerr Dam, and in anticipation of problems that might arise concerning the water table rise caused by the dam, the United States Geological Survey (USGS) began a study in 1928 entitled, "Effect Upon Ground Water Levels Of Proposed Surface Water Storage In Flathead Lake, Montana." This report is known as the "Cady

report" and was issued by the USGS in 1940. References will be made to this report herein as it is one of the base reports for the findings of fact and conclusions of law reached by the trial judge.

The Cady report predicted that the high water would slowly seep through the fine soils of the Blasdel farm and that it would take a number of years before the water table levels would reach the predicted level of 4.2 feet higher than the predam years. Contained in the Cady report were studies made from forty observation wells dug by the USGS commencing in 1928. These wells were in the vicinity of the Blasdel farm, and the recorded information was used to gather base line data on water tables for the Kerr Dam proposal.

Testimony and documentary evidence introduced at trial indicate the Blasdels first complained of damage to their land in 1941. Again in 1948 complaints were made and, as a result of complaints in 1957, a letter which was introduced at trial from Montana Power's land agent to Montana Power's attorney in Kalispell, Montana, noted: "If the proof develops strong enough, we may have to change our mind about not acknowledging any liability." On December 1, 1960, the first complaint in this matter was filed.

In all, five complaints have been filed in this action. The first complaint was filed on December 1, 1960, and noted that the Blasdels were "deprived . . . of unrestricted use for more than five years last past." This complaint also noted that the water flooded and remained on the lands in 1959 and 1960. The second complaint (the first amended complaint) was filed on December 31, 1965, and was

similar to the first complaint except that it specified that 134 acres had been completely destroyed and 126 acres partially destroyed. The third (second amended) complaint was filed on August 9, 1967, and was similar to the second complaint. The fourth (third amended) complaint was filed on June 25, 1971. For the first time it listed the specific date of injury, "1959," and alleged that 104 acres of land were completely destroyed and 121 acres were 75% destroyed. The complaint again referred to the continuous flooding in 1959-1960, and for the first time spoke of new damage in 1959-1960 and "a permanent taking." The final and fifth (fourth amended) complaint is similar to the fourth complaint filed except that larger amounts of damages were requested. The difference between the first and last complaints is largely a matter of damages claimed and semantics. The first complaint asked for $50,000 in damages and referred to flood waters remaining on the farm in 1959-1960. The last complaint asked for $142,847.89, plus interest, in damages and referred to the damage becoming permanent in 1959 and 1960.

The District Court made extensive findings of fact, forty-eight in number, and eight conclusions of law. In finding of fact no. 37, the court found that the post-dam water table at the Blasdel property rose 4.2 feet. Three feet of this was due to the Flathead Lake and 1.2 feet was due to increased precipitation. Montana Power claims the entire increase, if any, was due to increased precipitation.

Testimony indicates that the water table fluctuated until 1960. Although Blasdels first complained of damage in 1941, there were no problems during dry years such as 1955.

Consequently, the court found the problems caused by the gradually increasing water table were temporary before 1959-1960. In 1959-1960, the water table stabilized, and the problem became permanent.

The higher water table damaged the Blasdels in a number of ways. First, sloughs that were small or nonexistent in the past have significantly increased in size. As the sloughs increase in size, the amount of arable land decreases, the remaining fields assume irregular shapes, and it becomes more difficult to move farm machinery. Second, the salt and sodium content of the topsoil has increased dramatically. This soil, called "tuffitt," is very unproductive, very expensive to treat, and can affect adjacent land. Crop yields in the affected areas have declined from 33% to 100%. As a result, one of the two families that had farmed this land was forced to leave in 1960 to seek other employment. Third, in 1956 a new spring developed and began flowing across the Blasdel farm, saturating even more land.

Five issues are presented to this Court for review:

1. Is the plaintiffs' action barred by statute of limitations?

2. Is the plaintiffs' action barred by prescriptive easement?

3. Are the District Court's findings supported by substantial evidence?

4. Did the District Court err in admitting certain of the plaintiffs' exhibits?

5. Did the District Court err in allowing certain costs to the plaintiffs?

## I. STATUTE OF LIMITATIONS

Appellant, Montana Power Company, claims that the respondents first complained of the rising water table in 1941, that the cause of action started running in 1941, and that the statute of limitations, therefore, expired long before this suit was filed on December 1, 1960.

Appellant plead in its answer to the fourth amended complaint filed on April 27, 1973, as an affirmative defense, the three-year statute of limitations on actions "upon an obligation or liability, not founded on an instrument in writing, other than a contract, account or promise" (section 93-2605(3), R.C.M. 1947, now section 27-2-202, MCA); the two-year statute of limitions "for injury to or for waste or trespass on real or personal property" (section 93-2607(2), R.C.M. 1947, now section 27-2-303, MCA); and the five-year statute for all actions not otherwise covered (section 93-2613, R.C.M. 1947, now section 27-2-215, MCA). Later, after the respondents admitted that the appellant had invaded their land, the appellant filed a motion for summary judgment based on the defense of prescriptive easement.

The appellant cites a number of cases indicating that the cause of action started running when the damage first accrued. Heckaman v. Northern Pac. Ry. Co. (1933), 93 Mont. 363, 20 P.2d 258 (cause of action accrued when a railroad embankment caused flooding, not when built); Ackerman v. Port of Seattle (Wash. 1958), 329 P.2d 210 (action accrued when flights started, not when airport was built); United States v. Dickinson (4th Cir. 1946), 152 F.2d 865, aff'd., 331 U.S. 745, 67 S.Ct. 1382, 91 L.Ed. 1789 (1947) (action

accrued when flooding occurred, not when the dam was built);
Castro v. United States (Ct. Cl. 1974), 500 F.2d 436
(statute of limitation did not run until damages so
manifested themselves that a final account may be struck).
The appellant concludes that at least sixty acres of the
land flooded in the 1940s, and, consequently, the statute of
limitations (whether two, three or five years) expired long
before 1960. It further argues that this is true even if
the flooding was intermittent, citing Barnes v. United
States (Ct. Cl. 1976), 538 F.2d 865. In the instant case,
the damage was temporary prior to 1959-1960 and permanent
after 1959-1960. Therefore, if anything, the above-cited
cases actually support the respondents' position that the
cause of action did not start running until 1959-1960.

The only water table case cited by appellant is
Korgel v. United States (8th Cir. 1980), 619 F.2d 16. In
Korgel large amounts of diverted water ran off an airbase
and raised the water table in 1969 until it flooded the
plaintiffs' land. However, since the plaintiffs waited
until 1976 to file suit, the court found the action was
barred by applicable two-year statute of limitations
provision. In Korgel, the plaintiffs apparently waited
until five years after the water table stabilized to file
suit. Thus, Korgel is not on point.

At all times in the District Court the Montana Power
Company denied any damage. Therefore, it did not attempt to
prove a date of permanent injury other than to allege that
if the cause ripened, if ever it did, it did so in 1941 and
because the action here was not filed until 1960, the
statute barred respondents' action. Throughout its proof,

-8-

and to the day of oral argument of this appeal, appellant denied that the water table rose and denied that damage, if any, was due to the lake. Therefore, we find few facts on appellant's side to sustain its alternative claims of the statute of limitation and prescription. Indeed, as we will note later in considering the evidence produced here, the appellant offered no proof of how much the water table rose on the Blasdel farm due to the rise in the lake or when it rose.

The District Court made a final finding of fact that respondents ". . . could not with reasonable certainty ascertain permanent damage to any substantial portion of the [respondents'] land until the growing season 1959-1960." This finding is also stated as part of the first conclusion of law: "[Substantial damage to the respondents' land] . . . could not be reasonably ascertained until the growing season 1959-1960." On that basis, the court concluded: "Plaintiffs filed their complaint within the statute of limitations pertaining to a permanent taking." In so ruling, the court did not answer the issue of which statute of limitations is applicable in an inverse condemnation case of invasion by underground seep. To solve this issue we must begin with a case of this Court, Rauser v. Toston Irr. Dist. (1977), 172 Mont. 530, 565 P.2d 632.

In Rauser, this Court held that a rising water table is a "taking" or permanent invasion of land which is actionable. However, we have not previously addressed the issue of when that cause of action accrues. Paraphrasing Brigham Young when he arrived in Utah, "This is the time and the case." Dickinson v. United States (1947), 331 U.S. 745, 67

-9-

S.Ct. 1382, 91 L.Ed. 1789, is helpful:

"Property is taken in the constitutional sense when inroads are made upon an owner's use of it to an extent that, as between private parties, a servitude has been acquired either by agreement or in course of time. The Fifth Amendment expresses a principle of fairness and not a technical rule of procedure enshrining old or new niceties regarding 'causes of action'--when they are born, whether they proliferate, and when they die. We are not now called upon to decide whether in a situation like this a landowner might be allowed to bring suit as soon as inundation threatens. Assuming that such an action would be sustained, it is not a good enough reason why he must sue then or have, from that moment, the statute of limitations run against him. If suit must be brought, lest he jeopardize his rights, as soon as his land is invaded, other contingencies would be running against him-- for instance, the uncertainty of the damage and the risk of res judicata against recovering later for damage as yet uncertain. The source of the entire claim--the overflow due to rises in the level of the river--is not a single event; it is continuous. And as there is nothing in reason, so there is nothing in legal doctrine, to preclude the law from meeting such a process by postponing suit until the situation becomes stabilized. An owner of land flooded by the [defendant] would not unnaturally postpone bringing a suit against the [defendant] for the flooding until the consequences of inundation have so manifested themselves that a final account may be struck." 331 U.S. at 748-749, 67 S.Ct. at 1385, 91 L.Ed. at 1794.

In the instant case, as in Dickinson, Montana Power could have admitted liability years earlier and settled the claim. Instead, it denied liability. The Blasdels, who waited to sue until damages stabilized and became permanent should not be penalized. Thus, we hold that the damages stabilized in 1959-1960, the cause of action accrued at that time, and this action was not barred by the statute of limitations.

It should also be noted that even though the complaint was amended four times, the statute of limitations

was tolled when the first complaint was filed. Rule 15(c), M.R.Civ.P., provides that "whenever the claim . . . asserted in the amended pleadings rose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleadings, the amendment relates back to the date of the original pleadings."

Further, when a new theory of liability is based on the same facts as those brought to the attention of the opposite party by a previous complaint, no prejudice is worked by allowing the amendment. Rierson v. State (1980), ___ Mont. ___, 614 P.2d 1020, 37 St.Rep. 627; cf., Vincent v. Edwards (1979), ___ Mont. ___, 601 P.2d 1184, 36 St.Rep. 1886. In the instant case, the basic facts were all presented in the first complaint. Consequently, we hold that the amendments relate back to the original complaint.

II. PRESCRIPTIVE EASEMENT

Is the plaintiffs' action barred by prescriptive easement?

The party asserting a prescriptive easement must show (1) open, (2) notorious, (3) exclusive, (4) adverse, (5) continuous, and (6) uninterrupted use of an easement claimed for the full statutory period. Taylor v. Petranek (1977), 173 Mont. 433, 437, 568 P.2d 120, 122. Occupancy for a five-year period must also be shown. Sections 70-19-404 and 70-19-405, MCA.

Montant Power put all its eggs in one basket labeled "a denial of proximate cause." Here, appellant did not prove "open and notorious" occupation of the Blasdel land for any period of time; it did not prove the date when it

first "occupied" the Blasdel land; it did not prove a date when the lake influence became dominant; and it has consistently denied occupation of the land. Upon this record, the appellant failed to prove facts necessary to establish the elements of prescription.

We should also note that no intention to occupy the land has been shown. Montana Power has never claimed any right, title or interest in the Blasdel property. Intention is a central element of (1) prescriptive easements and (2) adverse possession. Consequently, appellant has failed to prove either claim. See, Lamme v. Dobson (1883), 4 Mont. 560, 2 P. 298; Blackfoot Land Development Co. v. Burks (1921), 60 Mont. 544, 199 P. 685; Stetson v. Youngquist (1926), 76 Mont. 600, 248 P. 196; Magelssen v. Atwell (1969), 152 Mont. 409, 451 P.2d 103; Brown v. Cartwright (1973), 163 Mont. 139, 515 P.2d 684. See also, Rude v. Marshall (1917), 54 Mont. 27, 166 P. 298; Brannon v. Lewis and Clark County (1964), 143 Mont. 200, 387 P.2d 706. We hold there was no prescriptive easement.

III.  DISTRICT COURT'S FINDINGS

Are the District Court's findings supported by substantial evidence?

Few cases that have reached this Court have had a longevity period greater than this case. Factwise it goes back to the decision of the federal government to build a dam in the early 1930s and to investigations made by federal and state agencies even prior to that time to prepare factual information on the feasibility of Kerr Dam. As previously noted, construction began in the early 1930s and

-12-

ended in 1939, at which time appellant took over the operation of the dam. The respondents first noted a change in their land and complained to the appellant in 1941. A twenty-year period went by before a complaint was finally filed for the damages to the property.

The files herein are numerous and the exhibits extensive. The trial court, facing the problem brought about by the case, bifurcated the the issues. In the first two-week trial, the court found Montana Power liable for damages to the Blasdel property. A second two-week trial established the extent of damages and just compensation. Montana Power appeals. This Court has had to consider a transcript of 2,670 pages, court files dating back to the early 1960s, and numerous exhibits. From all this, it can be seen that it has been a period of conflict for all parties involved. It is natural that there is a conflict of views on the evidence presented to the trial court upon which it made its decision.

This Court's standard of review is whether the findings of fact and conclusions of law are supported by substantial evidence. See, Kearns v. McIntyre Const. Co. (1977), 173 Mont. 239, 567 P.2d 433. The evidence must be reviewed in a light most favorable to the prevailing party in the District Court. Johnson v. Johnson (1977), 172 Mont. 94, 560 P.2d 1331. Rule 52(a), M.R.Civ.P., provides: "Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses."

Appellant argues that there is no credible evidence

to support the trial court's finding that the water table on the respondents' land had risen about 4.2 feet from 1938 to the present time. The holding of the trial court is as follows:

> "As compared to the water table on plaintiffs' land prior to 1938, the 1959-1960 water table was about 4.2 feet higher. Of this higher water table, about 1.3 feet was due to precipitation factors, and 3 feet due to the operation of the Kerr Dam. Of the precipitation factors a substantial portion of the same was the result of the operation of Kerr Dam and higher water tables."

During the 1930s, the USGS had Dr. Cady investigate the feasibility of Kerr Dam and the effect that the higher lake water level would have on ground water levels. The Cady report noted:

> "If the annual stage of the lake is raised through regulation from 2,884 feet to 2,890 feet, the average annual stage of a well 2,500 feet from the lake or the river will be raised from about 2,887 feet to about 2,893 feet. It indicates likewise that at other points in the interior of the area the water ground levels will rise from about the same amount that the average lake level is raised by regulation."

The appellant argues that the trial court erroneously relied heavily upon the respondents' expert, Dr. Robert Curry, a University of Montana geologist, who did not even see the respondents' farm until 1971. In addition, appellant contends that Dr. Curry relied upon a "faulty" 1938 study by the USGS known as the Cady report. Appellant further argues that in his report Dr. Cady assumed that the Flathead Lake would be full twelve months out of the year when it actually was full only four months of the year. Therefore, Cady's predictions are irresponsible, and Dr. Curry's opinions, based upon the Cady report, were totally inaccurate.

-14-

Respondents, in replying to appellant's argument, note that the Cady report of 1941 was based on a presumed average lake elevation of 2,890 FASL, which is the 1941-1949 average lake level. Thus, as predicted, the water table rose to a point of 2,892.

In addition, Dr. Curry in his study relied upon eleven observation wells near the respondents' farm. The eleven wells were monitored on a monthly basis from 1928 to 1976 and showed an average increase of 4.2 feet in the ground water level. An independent United States Department of Agriculture report issued in 1969 confirms this information. Further, a March 1960 report by the Montana Power hydrologist noted: "In future years the effect of the lake regulation will become increasingly noticeable and eventually the preregulation water table will rise by an estimated 3-5 feet as a consequence of the regulation." The appellant's expert hydrologist, Keith Anderson, on examination testified concerning the water table: "There certainly has been a rise in the water table, not only under his property, but practically under the entire area." With such a record before the trial court, we cannot say that it erred in finding that the water table had risen 4.2 feet.

As a part of this issue, we have before us the question of whether the rise in the water table was due to the operation of Kerr Dam or, as argued by appellant, due to precipitation. Both parties presented expert testimony. Dr. Curry testified for respondents, and Keith Anderson testified for the appellant. The following facts appear undisputed: (1) Montana Power Company controlled the level of Flathead Lake; (2) the average level of the Flathead Lake

rose 5.4 feet in 1959 and stabilized at an elevation of 2,890 feet; (3) for twenty-one miles upstream, to a point known as Foys Bend, the Flathead River is at the same level as Flathead lake; (4) the lake and the river "surround the Blasdel property"; (5) the Wiley Slough (one-fourth of a mile northwest of the Blasdel farm) is connected to the backwaters of the Flathead River; (6) the lake is the outlet of the ground waters such that raising the lake raises the ground water tables; (7) a number of old river channels cut across the lower valley, including the area of the Blasdel farm; and (8) the soils in the lower valley area are fine grain, glacial deposits such that ground water movement is very slow. The experts did not agree on two issues: (1) whether the ground tables in the interior area, more than a half mile from the reaches of the lake or river, would be influenced by the higher lake levels; and (2) whether the Wiley Slough influences the water tables at the Blasdel property one-quarter of a mile away.

The trial court had considerable expert testimony before it. Some of this testimony is conflicting and much can be interpreted either way. However, we can find no error with the basic findings of the trial court. It obviously accepted the testimony of respondents' principal witness, Curry, and rejected the testimony of appellant's witness, Anderson. The trial judge was entitled to accept one over the other in arriving at his ultimate decision. While there is a dispute as to whether the river and the lake (more than one-half mile away) and the Wiley Slough (one-fourth mile away) affect the water table on respondents' property, the inland water table was indeed

affected by the high water on the river, lake, and slough.

The appellant's entire defense on the water table issue seemed to be directed to the fact that 1941 through 1947 were wet years. It introduced testimony and charts showing that historically 1900 to 1917 were wet years, 1917 to 1941 were dry, and 1941 through 1970 were wet. Therefore, appellant argues that the rise in the water table was due entirely to increased precipitation. Credible testimony contradicting appellant's theory was accepted by the trial court. The court found: (1) unlike the 1950s, there was no water in the Grange Hall Slough during 1915-1920; (2) a new spring developed at 2893 FASL on the Blasdel farm in 1956; (3) maps and aerial photographs show far more surface water on the property in 1956 than was on the property in 1928; (4) there were no salt problems in the area in 1928; and (5) the water table dropped very little in dry years and rose dramatically in the 1950s. We find substantial credible evidence to support the court's findings in this matter.

IV. PLAINTIFFS' EXHIBITS

Did the trial court err in admitting certain of plaintiffs' exhibits? This objection is to surveys of the Blasdel farm, twenty-four photographs taken in 1970, 1971 and 1972 by respondents' attorney, and aerial photographs of the Blasdel farm taken in 1961, 1972 and 1974.

Plaintiffs' Exhibit P150 is the original survey of the Blasdel farm. Exhibit P154 shows various tracts in different colors and was introduced to show the degrees of soil damage. The colored tracts showed: area in red, 100% loss--no longer planted as of 1959; area in orange, 2/3 crop

loss, poor production due to salt; area in yellow, 1/3 crop loss, spotty areas of salt damage; and area in brown, no claim, pasture and other areas. The appellant objected to this exhibit on the grounds that it was a self-serving statement by Blasdel and had such a contaminating effect that it constituted error.

The record indicates that respondents offered ample foundation for the conclusions illustrated in the accepted exhibits. Blasdel testified that the red areas (100% loss areas) had been productive in the 1930s and were either under water or not planted in 1960 due to the wet conditions. For other areas, he estimated the yield he had received by measuring how much land had to be harvested to fill a forty-bushel hopper in his combine. This Court recognizes a farmer's competence to testify, with proper foundation, about the effects of water damage to his crop and land. Watson v. Colusa-Parrot Mining and Smelting Co. (1905), 31 Mont. 513, 79 P. 14. The color coded chart was properly admitted.

Should the photographs of the farm taken by respondents' counsel have been admitted? Appellant objects to the admission of some twenty-four snapshots taken in 1970, 1972, and 1973 by respondents' counsel. These photos were used to depict the "same" conditions in 1959, which was many years earlier. Therefore, according to appellant, they should not have been admitted. We find that the photographs were admitted to show "similar," not the same, conditions as those found in 1959 and, as such, are admissible. Lamb v. Page (1969), 153 Mont. 171, 455 P.2d 337; Teesdale v. Anschutz Drilling Company (1960), 138 Mont. 427, 357 P.2d 4.

-18-

Having previously found that the conditions of the property stabilized in 1959, the sloughs pictured in 1970, 1972 and 1973 were similar to the sloughs in 1959; thus, we find no error in admitting the photos.

Next the appellant objects to the aerial photographs of the farm, arguing that the aerial photographs of the Blasdel farm taken in 1961 were improperly admitted because this action had been filed in 1960, one year before and, therefore, the conditions after filing the suit were not at issue and the photos should not have been admitted. We find no merit to this argument due to the fact that damages stabilized in 1959-1960. The later photos objected to by appellant were representative of the 1959-1960 conditions and properly admitted.

The objection raised by appellant as to the aerial photographs taken in 1972 and 1974 is that they were irrelevant and "highly confusing and prejudicial." In addition, the appellant alleges that "since the action was filed in 1960, the only pertinent dates had to be prior to that time." We do not agree with appellant's position. Having established 1959 as the year of stabilization, it was necessary to have information both before and after 1959. These aerial photos helped to indicate the conditions on the farm not only in 1961 but 1974. They were properly admitted to indicate that after 1959 the conditions remained approximately the same for over fourteen years.

V.  LITIGATION EXPENSES

Did the trial court err in allowing litigation expenses to plaintiffs under section 70-30-306, MCA?  We

first note that the trial court held a one-day trial on litigation expenses at which the parties submitted documentary evidence in support of their fees in this matter. The statute here involved is section 70-30-306, MCA, which provides:

"Necessary expenses of litigation defined. (1) Necessary expenses of litigation as authorized by 70-30-305 mean reasonable and necessary attorney fees, expert witness fees, exhibit costs, and court costs. (2) Reasonable and necessary attorney fees are the customary hourly rates for an attorney's services in the county in which the trial is held. Reasonable and necessary attorney fees shall be computed on an hourly basis and may not be computed on the basis of any contingent fee contract entered into after July 1, 1977. (3) Reasonable and necessary expert witness fees may not exclude the customary rate for the services of a witness of such expertise in the county in which trial is held."

Appellant first charges that it should not be charged with "faulty work," alleging that the first three complaints were faulty work and should not be considered by the trial court. We note that no such finding was made by the trial court and that the court, in settling attorney fees, is entitled to award a reasonable and necessary number of attorney hours worked by the various attorneys.

Second, the appellant objects to what it calls hours spent "merely for attorney education." Appellant makes no reference to which hours are referred to. Counsel's time with consultants examining scientific information was necessary and reasonable, as found by the trial court, and we can find no error.

Third, appellant notes there was a contingency fee contract signed by respondents on April 7, 1972, and reaffirmed in 1979. Appellant claims that under State By

And Through Dept. of Hwys. v. Rogers (1979), ___ Mont. ___, 602 P.2d 560, 36 St.Rep. 1758, a contingency fee contract entered into prior to July 1, 1977, is controlling. We are puzzled by this claim that the trial court should have been held to the contingency fee contract. Here, the award of attorney fees was $77,277. As we view the record, a contingency fee contract based on the above-noted contracts would have totaled $100,000. In any event, under section 70-30-306(2), MCA, and our holding in State, By and Through State Hwy. Com'n v. Marsh (1978), 175 Mont. 460, 575 P.2d 38, a fee award solely based on a contingency fee contract would be error. The court had ample information and authority to award the fees as above noted, and we affirm the same.

Fourth, appellant objects to the trial court's award of $23,482.54 for "costs of litigation." This amount included sums for various "experts" which were never called as witnesses, and as such, argues appellant, payment was not authorized under section 70-30-306, MCA. We find that the trial court in its findings considered the expert costs carefully and set them forth. In reviewing the appellant's objections we find no reference in the above objection as to what amounts were not related. We have long held that we will not consider errors on appeal unless specifically set forth. See, Schilling v. Curran (1904), 30 Mont. 370, 76 P. 998. Further, it is not necessary that an expert be called at trial for his expense to be recoverable under section 70-30-306, MCA. Rogers, 602 P.2d at 562. We therefore find no merit to this final objection on the expert costs.

The judgment is affirmed.

John Conway Harrison
Justice

-21-

We concur:

_Frank J. Haswell_
Chief Justice

_Gene B Daly_

_[signature]_

_Daniel J. Shea_
Justices

_A. B. Martin_
Honorable A. B. Martin, District
Judge, sitting in place of Mr.
Justice Frank B. Morrison, Jr.

_Gordon R. Bennett_
Honorable Gordon R. Bennett,
District Judge, sitting in
place of Mr. Justice John C.
Sheehy