No. 01-302

IN THE SUPREME COURT OF THE STATE OF MONTANA

2003 MT 236

BRIMSTONE MINING, INC., a Montana Corporation,
et al.,

Plaintiffs and Respondents,

v.

JOHN GLAUS and MARIETTA GLAUS,

Defendants and Appellants,

JOHN GLAUS and MARIETTA GLAUS,

Counter-Claimants,

v.

BRIMSTONE MINING, INC., et al.,

Counter-Defendants.

APPEAL FROM:    District Court of the Fifth Judicial District,
                In and for the County of Madison, Cause No. 8467
                The Honorable Loren Tucker, Judge presiding.

COUNSEL OF RECORD:

        For Appellant:

        Max A. Hansen, Max A. Hansen & Associates, P.C., Dillon, Montana

        For Respondent:

        John S. Warren, Davis, Warren & Hritsco, Dillon, Montana

                                        Submitted on Briefs:  January 31, 2002
                                                Decided:  September 9, 2003

Filed

        _____
                                Clerk

Justice James C. Nelson delivered the Opinion of the Court.

¶1    Appellants John Glaus (Glaus) and Marietta Glaus (Marietta) appeal a judgment of the Fifth Judicial District Court, Madison County, finding a prescriptive easement over their property in favor of Brimstone Mining (Brimstone) and awarding damages to Brimstone for interference with the easement. Brimstone cross appeals, asserting the easement is a public right of way and that it is entitled to a larger award of damages. We affirm in part and reverse in part and remand for proceedings consistent with this Opinion.

¶2    We address the following issues on appeal and cross appeal:

¶3    1. Did the District Court err in concluding there is not an easement in favor of the public over the Glaus property?

¶4    2. Did the District Court err in concluding Brimstone established a prescriptive easement over the Glaus property?

¶5    3. Did the District Court err in concluding Brimstone's easement was not extinguished by reverse adverse possession?

¶6    4. Did the District Court err in concluding Brimstone made no enforceable oral agreement to dismiss this case?

¶7    5. Did the District Court err in awarding damages to Brimstone?

## I. FACTUAL AND PROCEDURAL BACKGROUND

¶8    This case concerns Brimstone's access to a gold and silver mine it owns near

2

Whitehall, Montana known as the Mayflower Mine (Mine).[1]  According to a news story in the Butte Daily Inter Mountain published on December 21, 1900, and reprinted in the Whitehall Ledger in January, 1994, the Mine was established in 1896 when Charles Pruett and his partners discovered gold ore.  Soon after, William A. Clark, a noted Butte mining figure, purchased the Mine.  Due to the richness of the ore deposit, a mining camp developed with two hotels, a store, a bar, a school, and homes.  In order to transport the ore to the nearest railroad siding at Renova south of Whitehall, the ore was hauled from the Mine across a road which this Opinion will refer to as the Old Mayflower Road.  From the Mine, this road heads generally north, northwest, over sections 32, 30, and 19 of T1N R3W, Madison County, until it meets the Parrot Bench Road which goes to Renova.[2]  By 1902, however, the ore deposit accessible at that time was exhausted and the Mine was shut down.

¶9     From 1902 until the 1920's, minor leasing activity occurred at the Mine.  In 1916, a farmer apparently attempted to plow across the Old Mayflower Road in section 19.  As a result, the West Mayflower Mining Company petitioned the Madison County Board of Commissioners (Board) to stop obstruction of the road.  The Board responded by declaring the Old Mayflower Road a public highway on June 5, 1916.

---

[1]To assist the reader, a map of the involved area is attached as an appendix to this Opinion.  This map was created by the Court by modifying an exhibit map in the record.

[2]There is evidence the ore might also have been hauled to Piedmont, a railroad siding also south of Whitehall but north of Renova, or to the Parrot Smelter.  However, these possibilities are not material to our Opinion here as the Old Mayflower Road was the road used to transport ore at that time to any destination.

3

¶10    In October 1924, the Board minutes indicate the Board was going to consider whether to abandon and close the Old Mayflower Road because an alternate route had been constructed. This alternate route ran along the section line following the west side of section 19 for its full length, then ran along the south side of section 19 for about 3/4 mile until it connected to the Old Mayflower Road. This alternate access is indicated on the attached map as the Alternate Route. However, the subsequent minutes do not indicate that any official action was ever taken; rather the minutes indicate the subject was postponed for later consideration. Then on May 1, 1944, the Alternate Route constructed along the section lines of section 19 was officially declared closed by the Board. In closing this road, the Board's closure language also includes that portion of the Old Mayflower Road that crosses the northeast corner of section 30, but none of the rest of the Old Mayflower Road. As a result, both the northern and southern portions of the Old Mayflower Road remain county roads, but the approximate ½ mile in the middle is not.

¶11    In 1928, the Anaconda Copper Mining Company (ACM) acquired the Mine property from the William A. Clark estate. In 1935, ACM reopened the Mine. Former employees of the Mine at that time who testified through deposition indicated that when the Mine was initially reopened, access to the Mine was over the Old Mayflower Road. Regarding the northern portion of the access, their testimony indicates they used the Old Mayflower Road rather than the Alternative Route along the section lines of section 19. However, after reopening, a new bridge was built across the Jefferson River known as the Mayflower Bridge. After the new bridge was built, the employee testimony indicates that access to the

4

Mine was over the "new" road down Mayflower Gulch, which is now commonly known as Mayflower Road. This change apparently occurred so the ore could be taken to a different railroad siding just north of the new bridge. The record indicates that in order to connect the bridge to Mayflower Road where it exits Mayflower Gulch at Parrot Bench Road, landowners in the area deeded land to the county so that a new county road could be built along the west section lines of sections 8 and 17. When the bridge, the road down Mayflower Gulch and the new county road were connected, all activity accessing the Mine occurred over this road.[3] There is testimony and evidence in the record that this change occurred anytime from 1936 to 1939.

¶12    At that time, the Mine employed between 100 and 200 people. Employees lived at the Mine site and also lived in Whitehall and the surrounding area and commuted to the Mine. Despite the extensive development at the Mine, in 1942 the Mine was ordered closed by the federal government because it was an activity that was not essential to the war effort. Thereafter, ACM hired a watchman and his wife to live at the Mine site. This watchman worked there until 1958 when ACM leased the mine to Frank Antonioli (Antonioli).

¶13    Antonioli worked the Mine full time and employed 20 to 25 people at the site. Again, some of the employees lived at the Mine site, while some commuted from the surrounding area. In 1961, the Mine again closed. However, Antonioli purchased the surface assets from ACM and periodically sold those assets until 1964. After 1964, ACM continued limited

---

[3]The portion of this road down Mayflower Gulch crosses the Glaus property and is the access in dispute here. (Indicated on the map by a dashed road).

exploration activity until 1985.  It was during this period of limited activity in 1979 that Glaus bought the land encompassing both Mayflower Gulch and a majority of the length of Mayflower Road.

¶14    In 1985, ACM sold the Mine to Howard Keck (Keck).  Keck then hired John Hunt (Hunt) to continue exploration activities.  Hunt in turn hired Antonioli to conduct some contract work.  In 1989, Madison County required removal of certain cattle guards.  In conjunction with removing the cattle guards, in 1990 Glaus built a fence along the northern boundary of his property along Parrot Bench Road.  In addition to the fence, Glaus installed a gate over the entrance to his property at Mayflower Road and placed a lock on the gate with no trespassing signs.  When Hunt encountered the locked gate, he walked up to the Glaus house to inquire.  Glaus gave him a key and told Hunt he could use the road with permission.  Hunt told Antonioli about this development and Antonioli also walked up to the Glaus house to get a key.  Glaus testified he also gave Antonioli a key to the lock to use the road with his permission.  Thereafter, Hunt, Antonioli, and any other employees of the Mine used the Glaus key to use the Mayflower Road access to the Mine.

¶15    Then in 1996, Brimstone and Antonioli bought the Mine and continued exploration activities.  Because Brimstone discovered potential ore deposits that it believes are commercially feasible to extract, Brimstone began to rehabilitate the Mine shafts in 1996.  While it is not clear from the record, apparently the increased activity associated with Brimstone's purchase gave rise to the dispute at hand.

¶16    In February 1996, Glaus wrote to Antonioli reiterating that use of Mayflower Road

6

over his property was with permission. Glaus also expressed concerns regarding the safety of his children and his livestock, and regarding noise and dust caused by increased traffic. Due to this letter, Brimstone and Glaus began discussions and attempted to negotiate an arrangement acceptable to both parties.

¶17    When continued discussions made the lack of agreement between the parties apparent, Glaus changed the lock and notified Brimstone of the change. Brimstone then brought this action to affirmatively establish an easement over Mayflower Road. Then, based upon indications of settlement from the parties to the court, proceedings in the trial court were postponed. As part of continued negotiations with Allan Kirk (Kirk), the general manager for Brimstone, Glaus allowed Brimstone temporary access to the Mine with the conditions that Brimstone maintain the road and spray for noxious weeds. Glaus also believed the temporary access was in exchange for dismissal of the lawsuit based on Kirk's representations. The agreement to temporarily use the road was written in two letters drafted by Kirk and signed by Glaus, but, according to Glaus, the agreement to dismiss the case was oral. Brimstone also negotiated, constructed, and paid for an alternative access to the Mine over the neighboring Temple Ranch. The northern portion of this current access is near the Old Mayflower Road. The southern portion of this current access is the Old Mayflower Road. Brimstone also notified and asked for approval from Madison County for Brimstone to maintain the southern portion of the Old Mayflower Road in sections 30 and 32 south of the Glaus property, even though it is a county road. The Board granted Brimstone its request.

¶18 When the court sent notice of dismissal for lack of prosecution of the case two years later, the parties asked that the case be reinstated. At trial, Brimstone alleged that the portion of Mayflower Road crossing the Glaus property was a public easement. Alternatively, Brimstone asserted it acquired a prescriptive easement over this portion of Mayflower Road. Finally, Brimstone asserted it suffered over $100,000 in damages from Glaus' wrongful interference with its use of the easement. In response, Glaus disputed both the public easement and the prescriptive easement. In addition, Glaus asserted he adversely possessed any prescriptive easement Brimstone might own by locking a gate and giving Brimstone access by permission for over five years. Alternatively, Glaus asserted Brimstone breached a pretrial oral settlement agreement to dismiss the lawsuit and that Brimstone should be estopped from pursuing its claims. Finally, Glaus also asserted he was entitled to damages for Brimstone's failure to spray for noxious weeds and failure to fix damages to the road caused by traffic to the Mine during the temporary use.

¶19 After a four day bench trial, the District Court issued findings of fact and conclusions of law. The court held there was no public easement over Mayflower Road as it crosses the Glaus property, that Brimstone acquired a prescriptive easement, and that Glaus did not adversely possess the easement. The court also held that the parol evidence rule and the statute of frauds required Glaus to demonstrate fraud by Brimstone in order to enforce any oral agreement to dismiss the lawsuit. Because Glaus did not introduce evidence of fraud, the court held Brimstone was not estopped from pursuing its claims. Finally, the court awarded Brimstone $75,000 in damages for Glaus's interference with its prescriptive

8

easement along with interest and costs of suit. Glaus now appeals the prescriptive easement, adverse possession and settlement agreement rulings. Brimstone cross appeals the public easement and damages rulings. Further facts are discussed in detail below as pertinent to each issue.

## II. STANDARD OF REVIEW

### A. Conclusions of Law and Findings of Fact

¶20 We review a district court's conclusions of law to determine whether that court's interpretation of the law is correct. *Olson v. Jude*, 2003 MT 186, ¶ 34, 316 Mont. 438, ¶ 34, 73 P.3d 809, ¶ 34. We review a district court's findings of fact to determine whether the findings are clearly erroneous. *Wareing v. Schreckendgust* (1996), 280 Mont. 196, 202-03, 930 P.2d 37, 41. A finding may be clearly erroneous if is it not supported by substantial evidence; if the district court misapprehended the evidence; or when our review of the record leaves the court with the definite and firm conviction that a mistake has been committed. *Daines v. Knight* (1995), 269 Mont. 320, 325, 888 P.2d 904, 906 (citing *Interstate Prod. Credit Ass'n v. DeSaye* (1991), 250 Mont. 320, 323, 820 P.2d 1285, 1287). However, the district court is in the best position to observe and judge the credibility of witnesses, therefore, "[w]e will not second guess the district court's determination regarding the strength and weight of conflicting testimony." *Double AA Corp. v. Newland & Co.* (1995), 273 Mont. 486, 494, 905 P.2d 138, 142. Further, we review a district court's findings to determine whether substantial evidence supports those findings, not contrary findings. *Rafanelli v. Dale* (1996), 278 Mont. 28, 37, 924 P.2d 242, 248. Finally, we will affirm a

9

trial court ruling if the court reached the correct result for the wrong reason. *State v. Parker*, 1998 MT 6, ¶ 20, 287 Mont. 151, ¶ 20, 953 P.2d 692, ¶ 20.

**B. The Elements of a Prescriptive Easement**

¶21    The first three issues presented on appeal address findings of fact regarding the existence of a prescriptive easement over Mayflower Road. Therefore, before turning to the first issue, we set out the general requirements for prescriptive easements. The party seeking to establish a prescriptive easement must show open, notorious, exclusive, adverse, continuous and uninterrupted use of the easement for the full statutory period by clear and convincing evidence. *Wareing*, 280 Mont. at 206, 930 P.2d at 43. If a claimant establishes the elements of open, notorious, continuous, uninterrupted and exclusive use of an easement, a presumption arises that the use is adverse to the servient estate and the burden shifts to the owner to show the use was permissive. *Wareing*, 280 Mont. at 209, 930 P.2d at 45; *Glantz v. Gabel* (1923), 66 Mont. 134, 141, 212 P. 858, 860.

¶22    The required elements are the same for public and private prescriptive easements. *Granite County v. Komberec* (1990), 245 Mont. 252, 257, 800 P.2d 166, 169 *overruled on other grounds by Warnack v. Coneen Family Trust* (1994), 266 Mont. 203, 879 P.2d 715. The only difference is that a public prescriptive easement requires qualifying use by the public, while a private prescriptive easement requires qualifying use only by the private party. Before 1953, the statutory period of use required was ten years, after 1953 and to the present, the statutory period is five years. Section 70-19-401, MCA. The period of prescriptive use by a claimant's predecessors in title inures to the benefit of the claimant.

10

Section 70-19-401, MCA; *Rude v. Marshall* (1917), 54 Mont. 27, 29-30, 166 P. 298, 298.

¶23     Open and notorious use is such that it gives the owner of the servient estate actual knowledge of the hostile claim, or is of such character as to raise a presumption of notice because it is so obvious the owner could not be deceived. *Mildenberger v. Galbraith* (1991), 249 Mont. 161, 167, 815 P.2d 130, 134-35. Continuous and uninterrupted denotes use not interrupted by an act of the owner of the land or by voluntary abandonment by the party claiming the right. *Hitshew v. Butte/Silver Bow County,* 1999 MT 26, ¶ 17, 293 Mont. 212, ¶ 17, 974 P.2d 650, ¶ 17. Adverse use is exercised under a claim of right--not as license revocable at the pleasure of the servient estate. *Public Lands Access Ass'n v. Boone & Crockett Club Found.* (1993), 259 Mont. 279, 283, 856 P.2d 525, 527. Exclusivity requires that the right to use does not depend on the like right in others. *Wareing*, 280 Mont. at 208, 930 P.2d at 44.

### III. DISCUSSION

¶24     **Issue One:  Did the District Court err in concluding there is not an easement in favor of the public over the Glaus property?**

¶25     We first consider the threshold issue raised by Brimstone of whether the public acquired a prescriptive easement over Mayflower Road. If a public easement exists, analysis of the other issues either changes substantially or becomes moot. Regarding a public prescriptive easement, the District Court first found that the portion of Mayflower Road from its junction at the north with Parrot Bench Road to where it joins the Old Mayflower Road

11

at the south had never been formally declared a public road. The District Court also concluded the public did not acquire an easement because the qualifying public use from 1936 to 1942, a period when possibly 200 employees worked at the Mine, did not continue for at least 10 years, the statutory period of use required before 1953. In addition, the District Court held that after 1942, only property owners along Mayflower Road or their agents used the road and that this use did not qualify as use by the public. The court noted that occasional recreational use by hunters, trappers, and berry pickers was not sufficient to raise a presumption of adverse public use. The court also noted that evidence of maintenance of the road by Madison County did not amount to a public adverse use because the maintenance was only on an "as requested" basis. Finally, the court recognized that Madison County had not intervened or joined in the case and that no member of the general public claimed a right to use the road.

¶26 Brimstone asserts that the District Court erred because in addition to the use between 1936 and 1942, Brimstone argues the mining activity from 1943 to 1996 demonstrated qualifying public use. Citing *Granite County*, 245 Mont. at 258-59, 800 P.2d at 170, Brimstone asserts that mining activity qualifies as public use. Further, Brimstone argues the evidence demonstrates the cyclical nature of the mining industry and that because mining is an important public interest, any claim for a prescriptive easement must allow for this typically cyclical use. In contrast, Glaus asserts the District Court correctly concluded the activity subsequent to the Mine's closure in 1942 was never sufficient to qualify as a public prescriptive easement. We agree with Glaus and with the District Court.

12

¶27 As the District Court noted, the portion of Mayflower Road crossing the Glaus property has never been formally declared a public road. Therefore, any public easement would exist through prescriptive use alone. Further, assuming use of Mayflower Road began in 1936, we agree that the use from 1936 to 1942 would qualify under the elements of a prescriptive easement, but that use simply did not continue for the statutory period of ten years. Again, when Antonioli leased the Mine from 1958 to 1961, that use may have also qualified, but it also did not continue for the statutory period of five years.

¶28 Therefore, the existence of a public easement in this case depends on the three remaining pieces of evidence: the exploratory use that took place when the Mine was not in full operation; recreational use by the public; and road maintenance by Madison County. Even taken together, this evidence does not rise to the level of public prescriptive use. Regarding the exploratory work, the evidence established that such work required only two or three employees for relatively short periods of time in the summer months. Such exclusive use by agents of the Mine does not represent continuous use by the public. *See Granite County*, 245 Mont. at 257, 800 P.2d at 169. Further, although Brimstone correctly cites *Granite County* as holding mining qualifies as a type of prescriptive public use, in that case mining was only one of a number of public activities on the road including logging, other timber management, fire protection and recreation. Further, the road in that case accessed a number of separately owned mining claims rather than only one as in this case. Finally, Granite County was the plaintiff in that case and asserted the public access unlike in this case where Madison County did not participate despite extensive notice.

13

¶29    Regarding public recreational use, every person who testified that they actually used Mayflower Road for recreational purposes also testified that they asked permission from Glaus or his predecessor in interest, Gene Clark (Clark). Every other person who testified regarding public recreational use merely speculated that other members of the public used the road in that way. Finally, regarding the Madison County road maintenance program, while one worker testified Mayflower Road was on the map in the road maintenance shop and it would not be on that map unless is was a county road that required regular maintenance, no one testified that the road was in fact maintained by the county more than a few times in 20 years. In addition, even though Madison County did assist Glaus in relocating the northern portion of Mayflower Road on his property, the evidence establishes that Madison County did this as part of an agreement with Glaus to relocate the portion of Parrot Bench Road on Glaus property, not as an exercise of jurisdiction over Mayflower Road. Therefore, the evidence establishes the District Court's conclusion holding no public easement exists over Mayflower Road on the Glaus property is correct.

¶30    **Issue Two: Did the District Court err in concluding Brimstone established a prescriptive easement over the Glaus property?**

¶31    We next consider the first issue raised by Glaus, whether the District Court erred in concluding Brimstone acquired a prescriptive easement. On this issue, the District Court did not make extensive findings or conclusions. Rather, the court simply noted that while the same evidence above did not qualify as a public easement, it did qualify as a private easement in Brimstone's favor. In addition, the court found that permission was never

14

required to access the Mine until Glaus locked the gate in 1990.

¶32	Glaus asserts that after the Mine was closed in 1942, any use was by permission and that there were gates and no trespassing signs put up along the roadway at some point. Glaus also argues any use of the road for exploratory purposes was sporadic and therefore insufficient to give notice or qualify as continuous. Brimstone asserts that the District Court properly determined its use of the roadway qualified under all the elements of a prescriptive easement. We agree with Brimstone and the District Court.

¶33	As mentioned, the activity and period of prescriptive use by a claimant's predecessors in title inures to the benefit of the current claimant. Therefore, Brimstone's claim of a prescriptive easement includes the activity on Mayflower Road from its first use in 1936 until the present. Given that there is virtually no evidence of restrictions on use of the road before 1961, except that some people asked Clark for permission as courtesy, we conclude that use of the road to access the Mine between 1936 and 1961 qualifies as a prescriptive easement. Even assuming use of the road did not begin until 1939, the record is undisputed that after the Mine closed in 1942, the caretaker and his wife continued to live at and access the Mine unimpeded until 1958. Further, use of this access to the Mine only increased after 1958 when the Mine went into full operation. Finally, the first testimony of any limit on access does not appear until 1961, when one person testified that a gate on the southern end of the Glaus property was locked by Clark after the Mine closed again, a point disputed by contrasting testimony. Therefore, the use of Mayflower Road previous to 1961 by Brimstone's predecessors met the requirements of open, notorious, exclusive, adverse,

15

continuous and uninterrupted use for the statutory period. Accordingly, the District Court properly concluded Brimstone acquired a prescriptive easement.

¶34 **Issue Three: Did the District Court err in concluding Brimstone's easement was not extinguished by reverse adverse possession?**

¶35 We next consider whether the court properly determined Brimstone's easement was not extinguished by adverse possession. On this issue, the District Court concluded that when Glaus locked the gate in 1990, this act was insufficient to give notice to Brimstone that Glaus was making an adverse claim. Specifically, the court held that the act of locking the gate and providing a key was insufficient notice to Brimstone because Brimstone could reasonably have interpreted this act "merely [as] an adverse claim against the general public." Further, the court stated that giving Brimstone's agents a key with permission was, in effect, not "a distinct and positive assertion *unequivocally hostile and adverse to [Brimstone]*" (emphasis in original).

¶36 Glaus argues the District Court erred in holding that locking the gate and giving Brimstone a key with permission was insufficient notice. Glaus asserts he regained control of the easement by locking the gate because under *Public Lands Access Ass'n* and *Downing v. Grover* (1989), 237 Mont. 172, 772 P.2d 850 *overruled in part by Wareing v. Schreckendgust* (1996), 280 Mont. 196, 930 P.2d 37, permissive use after a hostile act is sufficiently inconsistent to extinguish an easement. Again, Brimstone asserts the District Court correctly concluded that Glaus's activities did not meet the requirements of adverse possession. Under the facts of this case, we agree with Brimstone and with the District

16

Court.

¶37 The level of proof for extinguishment of an easement by reverse adverse possession is the same as the burden for establishing a prescriptive easement. *Halverson v. Turner* (1994), 268 Mont. 168, 174, 885 P.2d 1285, 1290. However, the burden shifts to the opposite party. Therefore, Glaus had the burden of proving by clear and convincing evidence that his claim to extinguish the easement was open, notorious, exclusive, adverse, continuous and uninterrupted.

¶38 We agree with the District Court that Glaus failed to meet this burden because it was reasonable for Brimstone to assume its easement was not extinguished when Glaus gave Hunt and Antonioli a key. Although the testimony is basically undisputed that Glaus gave the key with "permission," Glaus's acts were not sufficiently adverse to put Brimstone on notice. At best Glaus's conduct was equivocal. Glaus did not tell Brimstone's agents that the company did not have an easement, that he did not recognize their right of access, that he was taking back or reclaiming whatever right Brimstone thought it had to use the road, or that the road was his alone to use.[4] He did not require that access be at certain times or in a certain manner nor did he put any restrictions on the use or retention of the key. Further, the record indicates Glaus fenced his property when the cattle guards were removed as

---

[4]We acknowledge we have stated there is no requirement in Montana law that a prescriptive easement claimant verbally communicate a hostile intent. *Albert v. Hastetter*, 2002 MT 123, ¶ 28, 310 Mont. 82, ¶ 28, 48 P.3d 749, ¶ 28 citing *Warnack v. Coneen Family Trust* (1996), 278 Mont. 80, 83, 923 P.2d 1087, 1089. We reaffirm that rule. Here, however, the issue is the failure of Glaus to establish either by words or conduct his intent. While, in the presence of other evidence of intent, verbal communication is unnecessary, here Glaus's ambiguous "with permission" comment and his conduct may well have been clarified by the type of statements referred to.

17

required by Madison County and locked the gate to keep out increasing trespass by hunters, not to prevent Brimstone's continued use of its easement.

¶39    As the claimant of a prescriptive easement, albeit one in reverse, more was required of Glaus.  In *Brown v. Cartwright* (1973), 163 Mont. 139, 515 P.2d 684, we set forth the general rule as follows:

> [T]he question of adverse possession or occupancy is one of the intention of the parties [citing *Magelssen v. Atwell* (1969), 152 Mont. 409, 414, 451 P.2d 103, 105]:  "The law of this state is that: 'The question of adverse possession is one of intention.   The intention must be discovered from all the circumstances of the case.'  *Lamme v. Dodson* (1883), 4 Mont. 560, 591, 2 P. 298, 303; *Stetson v. Youngquist* (1926), 76 Mont. 600, 248 P. 196, 198."
>
> *3 Am.Jur.2d Adverse Possession* § 13, p. 91, puts the rule in a slightly different fashion:
>
>> While there is no fixed rule whereby the actual possession of real property by an adverse claimant may be determined in all cases, it may be stated as a general rule that the claimant's possession must be such as to indicate his exclusive ownership of the property.   Not only must this possession be without subserviency to, or recognition of, the title of the true owner, but it must be hostile thereto, and to the whole world.   It has been declared that the disseisor "*must unfurl his flag on the land, and keep it flying, so that the owner may see, if he will, that an enemy has invaded his domains, and planted the standard of conquest.*" [Emphasis in original].

*Brown*, 163 Mont. at 149, 515 P.2d at 690.  This theme has long been a part of Montana's law.  *See, e.g., Martin v. Randono* (1978), 175 Mont. 321, 328, 573 P.2d 1156, 1160; *Kessinger v. Matulevich* (1996), 278 Mont. 450, 925 P.2d 864; *Brannon v. Lewis & Clark County* (1963), 143 Mont. 200, 205, 387 P.2d 706, 709; *Le Vasseur v. Roullman* (1933), 93 Mont. 552, 557, 20 P.2d 250, 251.

¶40    Further, *Public Lands Access Ass'n* and *Downing* fit these criteria because in each of those cases, the acts extinguishing the easements were unequivocal. In *Public Lands Access Ass'n*, the servient estate completely blocked the road and allowed access by foot only. While *Downing* is similar to the facts of this case in that the servient estate erected and locked a gate, in that case the owner of the disputed easement eventually admitted having no easement and asked for permission to use the road.

¶41    In contrast, in this case, Glaus's words and deeds were consistent with his apparent desire to control wandering cattle and to prevent use of the road by those persons who had no right of access. Brimstone was not required to guess at Glaus's intention nor was it required to refuse to cooperate with Glaus in protecting his property from unauthorized use under peril of losing its own easement. If it was Glaus's intention to exclude Brimstone from the easement it had long enjoyed, then it was Glaus's obligation to make that design unequivocally clear to Brimstone. Glaus's ambiguous conduct simply did not rise to this level on the evidence presented here. While Glaus's actions and words may have been sufficient to prevent parties besides Brimstone from establishing a prescriptive easement, his conduct was not sufficiently adverse to repossess an already established easement. Therefore, the District Court properly held Glaus did not extinguish the easement by reverse adverse possession.

¶42    **Issue Four:  Did the District Court err in concluding Brimstone made no enforceable oral agreement to dismiss this case?**

¶43    We next consider whether the District Court erred in refusing to enforce any oral

19

agreement between the parties to dismiss the case. Regarding this issue, the court first held that under Rule 408, M.R.Evid., evidence of any temporary agreements to use Mayflower Road was not admissible to prove the validity of Brimstone's disputed claims for a prescriptive easement. However, the court did consider the evidence to determine whether there was an enforceable oral agreement to dismiss the case. On this point, the court held that the parol evidence rule and the statute of frauds prohibited admission of evidence of an oral agreement to dismiss the case since the temporary access agreements were in writing. However, the court also went on to hold that Glaus failed to meet any possible exception to application of the parol evidence rule or the statute of frauds based on fraud or detrimental reliance because Glaus did not prove the elements of fraud.

¶44 Glaus asserts the District Court erred by failing to hold Brimstone must be estopped from asserting its claims for a prescriptive easement because Kirk orally agreed to dismiss Brimstone's claims to Mayflower Road and Glaus detrimentally relied on his promise by fully performing his side of the agreement. Glaus also argues that equitable estoppel is an exception to the statute of frauds and that an intent to deceive, as required for fraud, is not required here. Finally, Glaus points out that Brimstone did not have Kirk testify to dispute the terms of the oral agreement and therefore, Brimstone did nothing to disprove the undisputed testimony from him and his wife. In addition, because he and his wife both testified, Glaus asserts the District Court erred in holding his testimony of the oral agreement was unsubstantiated.

¶45 Brimstone asserts the District Court properly determined Glaus did not offer sufficient

20

evidence to meet either a fraud or an equitable estoppel exception to the parol evidence rule. Further, Brimstone asserts the court's findings on this issue were based on substantial evidence. Specifically, Brimstone notes that even though Kirk did not testify, the current president of Brimstone, David Roving (Roving) testified that Brimstone did not agree to dismiss the case. Brimstone also notes that neither of the parties discussed an agreement to dismiss the case with counsel, even though at that point both were represented by counsel.

¶46    We agree the District Court reached the correct result, albeit for the wrong reasons. First, regarding the parol evidence rule, this rule only bars evidence of oral agreements when the terms of a written agreement indicate the intent of the parties that the written memorialization represents the complete and final agreement between the parties. *State v. Frederick* (1984), 208 Mont. 112, 115, 676 P.2d 213, 215; *Norwest Bank Billings v. Murnion* (1984), 210 Mont. 417, 423, 684 P.2d 1067, 1071. Often this intent is expressed with an integration clause that simply states the written document is the complete agreement.

¶47    In this case, the District Court automatically applied the parol evidence rule without determining whether it applied. Consequently, the court made no findings indicating why it believed the written letters represented a complete agreement between the parties. After reviewing the letters, we cannot agree the parol evidence rule applies here. On the contrary, nothing about the letters indicates an intent that the documents represent a complete and final agreement. Rather, the letters by their own terms are only addressed to specific issues such

21

as road maintenance and stream re-channeling.[5] Indeed, the mere fact there is more than one written agreement between the same parties regarding the same area indicates this is a unique situation where the parties did not intend the written documents to memorialize a final and complete agreement. Therefore, we hold the District Court erred in automatically applying the parol evidence rule and we conclude the rule does not apply in this case because there is no evidence that the parties intended the letters to represent their final and complete agreement. Therefore, evidence regarding the terms of any oral agreement between the parties was admissible.

¶48 Second, the court also automatically applied the statute of frauds to this case without indicating its grounds. Nothing in the statute by its terms requires a settlement agreement to dismiss a claim to be in writing. *See* § 28-2-903, MCA. Therefore, the District Court also erred in automatically applying this rule as well, without stating a basis.

¶49 Given that these two rules do not bar the admission of evidence or the enforceability of an oral agreement, the trial court was free to consider the substantive merits of the existence of an oral contract. In fact, the court did hear all the evidence on this issue, reserving its rulings on admissibility. So Glaus was permitted to present his full case regarding the oral agreement.

---

[5]Each letter was addressed to both Glaus and to Marietta. Each ends with a statement and signature lines, both of which Glaus signed. Marietta only signed the stream re-channeling letter. The road maintenance letter statement reads: "We have read the above letter and Brimstone Mining Inc. has our approval to proceed with the road grader and road maintenance work described above." The stream re-channeling letter statement reads: "We have read the above letter and Brimstone Mining Inc. has our permission and approval to proceed with the work described above."

22

¶50    After reviewing the record, we hold that although the District Court's finding of fact related to this issue was considered in light of its determination that Glaus was required to meet the elements of fraud or detrimental reliance, the District Court's sole finding nonetheless disposes of the issue of the existence of an oral agreement. As mentioned above, the District Court is in the best position to judge the credibility of the witnesses and weight of the evidence. In this case, the District Court did state it found Glaus's story unsubstantiated. Glaus and Marietta testified that the oral agreement was made, while Roving testified no such agreement was made. Kirk, while he was an agent likely authorized to make agreements on behalf of Brimstone, did not testify. We cannot agree with Glaus based on these slim facts that he met his burden of proof by a preponderance of the evidence that an agreement to dismiss the suit was made. While Glaus asserts it was Brimstone's burden to call Kirk to testify to rebut his and his wife's testimony, we disagree. Because Glaus had the burden of proving an oral agreement was made, Glaus had the burden to call Kirk to testify regarding the promises he allegedly made. In sum, the District Court automatically applied the parol evidence rule and the statute of frauds without properly determining whether either applied. However, we hold that by refusing to enforce the oral agreement based on the facts before it, the court reached the correct result.

¶51    **Issue Five: Did the District Court err in awarding damages to Brimstone?**

¶52    Finally, we consider whether the District Court erred in awarding Brimstone $75,000 in damages for Glaus's wrongful interference with its easement. On this issue, the District Court did not indicate how it arrived at that figure. Brimstone asserts the court erred because

23

it introduced undisputed testimony that it suffered $102,188.44. Glaus points out that Brimstone did not meet the terms of the temporary use agreement by spraying for noxious weeds or by repairing a cattle guard. Further Glaus asserts there is a designated county road across the neighboring Temple Ranch which Brimstone should have used rather than paying for access.

¶53 After reviewing the record, we agree with Glaus. The District Court held that the Old Mayflower Road which runs diagonally across section 19 was abandoned. This finding is clearly erroneous. The documents submitted in this case regarding the Old Mayflower Road conclusively establish that it's northern portion has never been abandoned. Indeed, Brimstone itself takes the position that a designated county road exists until officially closed and that the southern portion of the Old Mayflower Road is still a designated county road. Section 7-14-2615, MCA. Brimstone cannot have it both ways. The only portion of the Old Mayflower Road which has been officially abandoned by Madison County is the ½ mile long stretch that crosses the northeast corner of section 30 and which crosses Glaus property. Therefore, Brimstone unnecessarily paid for private access across the neighboring Temple Ranch. Accordingly, Glaus is not liable for those damages.

¶54 Further, Brimstone submitted damages for road plowing, maintenance, insurance and spraying of noxious weeds. However, regarding at least some of these types of damages, Brimstone would have had to incur these expenses even if it used the Mayflower Road across Glaus property. Simply because Brimstone had an easement does not mean Glaus had to bear the entire burden of maintaining the roadway. Therefore, to the extent the District

24

Court awarded damages Brimstone would have incurred no matter what access it used, the District Court erred. Because there is no discussion of how $75,000 was determined, we cannot address this figure. Therefore, we remand for proceedings to determine damages consistent with this Opinion.

## IV. CONCLUSION

¶55 Because the District Court correctly determined the contours of the easement over the Glaus property, we affirm. However, because the District Court incorrectly calculated damages to Brimstone, we reverse and remand for the District Court to recalculate damages consistent with the direction in this Opinion.

¶56 We affirm in part and reverse in part and remand for proceedings consistent with this Opinion.

/S/ JAMES C. NELSON

We Concur:

/S/ KARLA M. GRAY
/S/ JOHN WARNER
/S/ W. WILLIAM LEAPHART
/S/ JIM RICE

Justice Patricia O. Cotter dissents.

¶57 I respectfully dissent from the Court's disposition of Issue No. 3. I would conclude that Brimstone's easement, if indeed it had one, was extinguished by reverse adverse

27

possession.

¶58    As the Court notes at ¶¶ 14-16, Glaus built a fence on the northern boundary of his property along Parrot Bench Road in 1990, and then installed a gate over the entrance to his property at Mayflower Road and placed a lock on it. He erected "no trespassing" signs. When Brimstone's agents encountered the gate, Glaus gave them a key and told them they could use the road with permission. This state of affairs continued for over five years. As the Court notes in ¶ 16, Glaus wrote to Antonioli in January 1996, reiterating that use of Mayflower Road over his property was with permission. The Court even concedes at ¶ 38 that the testimony was undisputed that Glaus gave Brimstone's agents a key and "permission" to use the road.

¶59    I disagree with the Court's conclusion that "more" was required of Glaus than blocking the road, posting "no trespassing" signs, issuing a key, and telling Brimstone's agents that use of the road would be with permission only. ¶ 39. As to Brimstone, Glaus showed open, notorious, exclusive, adverse, continuous and uninterrupted use of the easement for the full statutory period, by clear and convincing evidence. *Wareing*, 280 Mont. at 206, 930 P.2d at 43. In fact, as indicated above, the evidence to this effect was uncontradicted. Under our adverse possession jurisprudence, this showing is sufficient. "More" is not required. Therefore, I would conclude that Glaus established that Brimstone's easement was extinguished by reverse adverse possession.

¶60    I would not disturb the District Court's ruling with respect to the oral agreement. I would, however, conclude that the District Court erred in awarding damages to Brimstone, and I would remand for a hearing on the question of whether and to what extent Glauses are entitled to damages.

28

                                        /S/ PATRICIA COTTER


Justice Jim Regnier concurs in the forgoing dissent.


                                        /S/ JIM REGNIER



          * * *  SEE HARD COPY OF OPINION FOR MAP ATTACHED * * *