FILED

06/24/2025

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 24-0489

DA 24-0489

IN THE SUPREME COURT OF THE STATE OF MONTANA

2025 MT 131

IN RE THE GRANDPARENT-GRANDCHILD
VISITATION OF:

A.L.U.,

SHARLINE BLUEMEL,

      Petitioner and Appellee,

   and

ASHLEY UHRICH and VIJAY
UHRICH,

      Respondents and Appellants.

APPEAL FROM:    District Court of the Twentieth Judicial District,
In and For the County of Lake, Cause No. DV-23-117
Honorable John A. Mercer, Presiding Judge

COUNSEL OF RECORD:

      For Appellants:

            Casey L. Emerson, Clinton J. Fischer Law Office, P.C., Polson,
Montana

      For Appellee:

            Kevin H. Ness, Johnson, Berg & Saxby, PLLP, Kalispell, Montana

           Submitted on Briefs:  April 2, 2025
                 Decided:  June 24, 2025

Filed:

                _____
                         Clerk

Justice Ingrid Gustafson delivered the Opinion of the Court.

¶1 Ashley and Vijay Uhrich (the Uhrichs), paternal grandparents and adoptive parents of A.L.U., appeal from the July 19, 2024 Findings of Fact, Conclusions of Law and Order issued by the Twentieth Judicial District Court, Lake County. The District Court's order granted, in part, maternal grandmother Sharline Bluemel's Petition for Grandparent Visitation and allowed Sharline limited supervised visitation time with A.L.U.

¶2 We address the following restated issue on appeal:

*Whether the District Court erred when it granted Sharline's petition for grandparent visitation over the objections of the Uhrichs.*

¶3 We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

¶4 A.L.U. was born to Rozlyn Bluemel and Tyler Uhrich in March 2020. Rozlyn and Tyler were in a long-term relationship but were not married. By 2022, Rozlyn and Tyler had become estranged. On May 10, 2022, Tyler murdered Rozlyn by chasing her into the woods and then shooting her in the back of the head execution-style. Tyler left A.L.U. strapped into her car seat in his still-running vehicle and fled the murder scene on foot. Tyler was apprehended by law enforcement after he showed up at the Uhrichs' home a few days later. The Montana Department of Public Health and Human Services, Child and Family Services Division (Department), placed A.L.U. in the care and custody of the Uhrichs after Rozlyn's murder. The Department opened a dependent neglect (DN) case and filed a Petition for Emergency Protective Services on May 12, 2022. A.L.U. remained with the Uhrichs during the pendency of the DN case, while Sharline had 3-hour visits with

2

A.L.U. every Friday. Tyler's parental rights were terminated in February of 2023, following his relinquishment of parental rights in the DN proceeding and guilty plea to deliberate homicide in his criminal case. A.L.U. was adopted by the Uhrichs on June 15, 2023. Immediately after the adoption was completed, the Uhrichs terminated all visitation between Sharline and A.L.U.

¶5 On July 21, 2023, Sharline filed a Petition for Grandparent Visitation in the District Court. Sharline's proposed visitation plan would have had A.L.U. continue to reside primarily with the Uhrichs, but greatly increased Sharline's visitation time from what was provided by the Department when it had temporary legal custody of A.L.U.—Sharline sought twice-weekly visits, including an overnight visit, for A.L.U. to reside with her the entire month of June, and 12-hour visits on certain holidays and family birthdays. The Uhrichs filed an Answer opposing Sharline's petition on August 21, 2023. Pursuant to a stipulation, attorney Marybeth Sampsel was appointed Guardian ad Litem (GAL) for A.L.U. and directed to investigate the matter to determine whether grandparent contact with Sharline was in A.L.U.'s best interest and, if so, what schedule for grandparent contact would serve A.L.U.'s best interests. The GAL investigated the matter and filed a report on April 26, 2024. The GAL's report determined "[l]imited grandparent-grandchild contact would likely be in [A.L.U.'s] best interest" because it was important for A.L.U. to have contact with her maternal relatives to learn and understand who her mother was due to the circumstances of Rozlyn's death—being murdered by Tyler, A.L.U.'s father (and now adoptive brother) and the Uhrichs' son. The GAL also explained the Department was disappointed the Uhrichs had completely cut off Sharline from contact as they tried to

3

prevent such a situation from happening prior to the Uhrichs' adoption of A.L.U.  The GAL further noted contact with A.L.U. could be healing to Sharline and Rozlyn's sisters, Madison and Elizabeth, as they dealt with the aftermath of Rozlyn's murder by Tyler. Nevertheless, the GAL recommended the District Court deny Sharline's petition because there was not sufficient information to rebut the legal presumption provided by § 40-9-102(4), MCA, in favor of the Uhrichs' wishes as fit parents.

¶6     The District Court held a hearing on the petition on June 28, 2024.  At the hearing, the court heard the testimony of Madison Bluemel, Rozlyn's sister; Brittany Tagle, Sharline's friend; Sharline; Monica Nethercott, Sharline's friend; Ashley; Vijay; Tuesday Hesselgesser, a teacher at A.L.U.'s daycare; GAL Sampsel; Joanna Keenan, Sharline's estranged sister and friend of the Uhrichs; Quinn Clairmont, Sharline's estranged brother; Shannon Wall, "[k]ind of in-laws" with the Uhrichs; Crystal Perry, friend of the Uhrichs; and Kathy Jenson, Vijay's aunt.  The testimony at this hearing revealed the long, complicated, and strained relationship between Sharline and the Uhrichs—in addition to Tyler's murder of Rozlyn, Ashley had an affair with Rozlyn's father Jeremy, Sharline's husband (now ex-husband), in 2011, leading to the parties not speaking for several years, and Sharline testified to Tyler harassing her once he began dating Rozlyn.  The testimony also addressed Rozlyn's strained relationship with Sharline, which appeared to be mending in the months before her death, both parties' history with the Department, and the Uhrichs' concerns around A.L.U.'s visitations with Sharline.  The District Court ultimately granted Sharline's petition for grandparent-grandchild contact and set a visitation schedule which

4

allows Sharline to have four-hour supervised visits with A.L.U. once every two months "at an agreed upon location/provider and at [Sharline's] expense."

¶7     The Uhrichs appeal. Additional facts will be discussed as necessary below.

## STANDARD OF REVIEW

¶8     We review a district court's interpretation and application of statutes for correctness. *In re Grandparent/Grandchild Contact of C.A.G.*, 2014 MT 290, ¶ 10, 376 Mont. 540, 337 P.3d 751 (citing *Polasek v. Omura*, 2006 MT 103, ¶ 8, 332 Mont. 157, 136 P.3d 519). We review a district court's findings of fact to determine whether they are clearly erroneous. *Glueckert v. Glueckert*, 2015 MT 107, ¶ 8, 378 Mont. 507, 347 P.3d 1216 (citing *Brimstone Mining, Inc. v. Glaus*, 2003 MT 236, ¶ 20, 317 Mont. 236, 77 P.3d 175). "A finding of fact is clearly erroneous only if not supported by substantial evidence, the court misapprehended the effect of the evidence, or, based on our review of the record, we have a definite and firm conviction that the lower court was mistaken." *In re Marriage of Bessette*, 2019 MT 35, ¶ 13, 394 Mont. 262, 434 P.3d 894.

## DISCUSSION

¶9     *Whether the District Court erred when it granted Sharline's petition for grandparent visitation over the objections of the Uhrichs.*

¶10     The Uhrichs assert the District Court erred by improperly applying a standard related to A.L.U.'s constitutional rights rather than the statutory standard providing a presumption in favor of their wishes as fit parents. The Uhrichs further assert the District Court improperly substituted its own judgment regarding A.L.U.'s best interests for that of the Uhrichs. Sharline contends the District Court did address the statutory presumption in

5

favor of the Uhrichs' wishes and properly determined there was sufficient evidence to rebut the presumption. Sharline asserts the District Court correctly found contact was in A.L.U.'s best interest, the visitations were reasonable in light of her previous history of visitation, and any objections made by the Uhrichs "are addressed by her visits being supervised and at neutral locations."

¶11 Montana's Legislature has adopted provisions providing for reasonable rights to grandparent-grandchild contact and set forth procedures to be followed in such cases. Sections 40-9-101–103, MCA.[1] When considering a petition, a district court must first make a determination as to whether the objecting parent is a fit parent, which "must be determined on the basis of whether the parent adequately cares for the parent's child." Section 40-9-102(2), MCA. If the court determines the objecting parent is a fit parent, a presumption in favor of the parent's wishes attaches and grandparent-grandchild contact "may be granted only upon a finding by the court, based upon clear and convincing evidence, that the contact with the grandparent would be in the best interest of the child and that the presumption in favor of the parent's wishes has been rebutted." Section 40-9-102(4), MCA.

¶12 We disagree with the Uhrichs' initial contention that the District Court failed to properly apply the grandparent-grandchild contact statute in this case. The District Court's Findings of Fact specifically addressed the Uhrichs' fitness as parents, their objections to

---

[1] These contact provisions are not the exclusive remedy available to grandparents, who retain, either in addition to or in lieu of filing a petition under the contact statutes, their statutory rights to seek parental interests, visitation, a parenting plan, authority as a caretaker relative, custody, adoption, and/or guardianship of the grandchild. Section 40-9-202, MCA.

A.L.U. having contact with Sharline, and A.L.U.'s best interests as the statute requires. Section 40-9-102(2), (4), MCA. Following its Findings of Fact, the District Court issued its Conclusions of Law. As relevant here, Conclusion of Law #2 stated:

> The [c]ourt determines there is clear and convincing evidence that some visitation between A.L.U. and her maternal grandmother Sharline under the circumstances of this case is in A.L.U.'s best interests and rebuts the presumption in favor of following the desires of the adoptive parents, the Uhrichs.

While the District Court failed to cite the specific statute at issue here, there can be no doubt the court was expressly considering § 40-9-102(4), MCA, when it issued Conclusion of Law #2. "The litmus test is whether a district court's order sets forth reasoning, based upon its findings of fact and conclusions of law, in a manner sufficient to allow informed appellate review. If a trial judge's findings and conclusions are clear to this Court, failure to state them in the recommended form is not substantial error." *Snavely v. St. John*, 2006 MT 175, ¶ 11, 333 Mont. 16, 140 P.3d 492 (internal citations omitted). It is abundantly clear to this Court that the District Court properly considered § 40-9-102(4), MCA, when issuing its order.

¶13 "A parent retains a fundamental right to make decisions concerning her child's care, custody and control. The best interest of the child remains intact as the standard by which a grandparent's request for contact must be judged." *Glueckert*, ¶ 11 (internal citations omitted).

¶14 Turning to the substance of the District Court's order, we first note that all parties agree the Uhrichs are fit parents to A.L.U. pursuant to § 40-9-102(2), MCA, and the statutory presumption in favor of their wishes, § 40-9-102(4), MCA, applies in this matter.

7

"If the parent is fit, a presumption arises in favor of the parent's wishes because 'the Due Process Clause does not permit a State to infringe on the fundamental right of parents to make childrearing decisions simply because a state judge believes a "better" decision could be made.'" *Polasek*, ¶ 15 (quoting *Troxel v. Granville*, 530 U.S. 57, 72-73, 120 S. Ct. 2054, 2064 (2000)). In such a case, contact may be granted over a fit parent's objections "if clear and convincing evidence establishes that the contact would be in the best interest of the child and the presumption in favor of the parent's wishes has been rebutted." *In re Grandparent/Grandchild Contact of C.A.G.*, ¶ 12 (citing § 40-9-102(4), MCA). "Clear and convincing evidence is more than a mere preponderance of the evidence, and requires evidence that is definite, clear and convincing. It does not mean unanswerable or conclusive evidence or evidence beyond a reasonable doubt." *Glueckert*, ¶ 10 (citing *Thibodeau v. Bechtold*, 2008 MT 412, ¶ 23, 347 Mont. 277, 198 P.3d 785).

¶15 The District Court reviewed a thorough investigative report filed by the GAL and heard testimony from 13 witnesses at the hearing prior to determining the presumption in favor of the Uhrichs' wishes for A.L.U. to have no contact with Sharline had been rebutted and that occasional supervised visits with Sharline were in A.L.U.'s best interest. The District Court found "[m]uch of the testimony was unreliable hearsay, irrelevant as to alleged conduct many years in the past, and based on obvious personal grudges," and should not be a reason to deny A.L.U. contact with her maternal grandmother. "The District Court held the hearing, received the testimony, observed the witnesses, and is in the best position to weigh the evidence." *Glueckert*, ¶ 15.

¶16    In *In re Grandparent/Grandchild Contact of C.A.G.*, we upheld a district court's order granting grandparent-grandchild contact but reversed a portion of the court's order which would have granted the grandparent extended visits in Washington state because we determined the court incorrectly concluded the presumption in favor of the fit parent's wishes was rebutted regarding the specific visitation schedule and noted the visitation plan otherwise enabled the children to build a relationship with the grandmother through phone contact, video calls, and visits in Montana. *In re Grandparent/Grandchild Contact of C.A.G.*, ¶¶ 18-19. We held the objecting parent "offered reasoned objections that were not rebutted" by the grandmother regarding the Washington visits and struck that provision of the plan but otherwise upheld the district court's decision. *In re Grandparent/Grandchild Contact of C.A.G.*, ¶¶ 19-20.

¶17    The Uhrichs assert they have reasoned objections to A.L.U. having any contact with Sharline—essentially claiming Sharline is an unsafe, criminal drug addict and that A.L.U. had negative health reactions when she visited Sharline during the time the Department had temporary legal custody. The District Court heard the evidence on these points and found, in Finding of Fact #13, "[n]o medical evidence was presented at the hearing to support the claim that A.L.U.'s gastrointestinal issues were related to contact with Sharline. No evidence was provided that Sharline currently uses drugs or used drugs during visits with A.L.U." The court's finding in this regard is not clearly erroneous as it is supported by substantial evidence. Ashley testified an endoscopy determined A.L.U.'s vomiting episodes were stress-related, but provided no evidence beyond her personal opinion to support her claim the visits with Sharline were to blame. At the time, A.L.U. was two

9

years old and her mother had just been murdered by her father, who then abandoned her in his truck, essentially leaving her to die as well had she not been discovered by law enforcement the night of the murder. She was then placed into the care of, and adopted by, the parents of her mother's killer—undoubtedly a stressful situation for a child. Regarding the Uhrichs' claim Sharline is a drug addict, Sharline admitted to previously being addicted to pain pills but denied any recent use and noted she had been sober from illicit drugs since 2018. The District Court took note of Sharline's previous drug and alcohol use, but determined there was no evidence of current use or use during Sharline's visits with A.L.U. Again, this finding is supported by substantial evidence. Beyond Sharline's admission to a previous struggle with pain pills several years in the past, the testimony provided at the hearing asserting Sharline was abusing drugs and alcohol was, in the words of the District Court, "unreliable hearsay, irrelevant as to alleged conduct many years in the past, and based on obvious personal grudges[.]" The Uhrichs' stated concerns with the condition of Sharline's house was also not a reasoned objection because they were unaware Sharline had moved to Kalispell and had no knowledge of the condition of her home. In addition, the District Court's visitation schedule provided that any visits were to be supervised and at a location which the Uhrichs must agree upon with Sharline. Assuming the Uhrichs do not agree with A.L.U. having visits at Sharline's home, visits will simply not occur there pursuant to the plain language of the court's visitation order.

¶18 The best interests of the child is the standard by which a grandparent's request for contact must be judged, even when presented with an objection by a fit parent. *Glueckert*, ¶¶ 10-11; § 40-9-102(4), MCA. It is the burden of the petitioning grandparent to provide

10

clear and convincing evidence that contact is in the child's best interests and the presumption in favor of the fit parent's wishes has been rebutted. Section 40-9-102(4), MCA. The District Court considered the best interests of A.L.U. when reaching its decision, and we disagree with the Uhrichs' contention the court "shifted the burden to prove that it is not in A.L.U.'s best interests to have contact with Sharline" in this case. The GAL's report noted contact with Sharline was in A.L.U.'s best interest as it could allow A.L.U. to maintain some understanding of who her mother was, what she was like, and the things they have in common. The Department sought to maintain contact while it had custody of A.L.U. prior to the adoption and believed the Uhrichs would make an effort to maintain some kind of contact with A.L.U.'s maternal grandmother. Sharline's testimony revealed her relationship with Rozlyn was admittedly strained when Rozlyn was younger, but began mending after A.L.U. was born—progressing from "sporadic" contact to weekly visits prior to the murder. Sharline noted these visits were essentially done in "secret" due to Tyler disapproving of Rozlyn mending her relationship with Sharline and becoming violent with Rozlyn when he thought they were talking to each other. The District Court found "[w]here her mother was murdered by her adoptive parents' son, her father now her stepbrother, it is important for A.L.U.'s well-being to preserve a connection with her maternal grandmother." This finding is not clearly erroneous and is supported by substantial evidence. A.L.U. having a link to the maternal side of the family is in her best interest, *see In re Grandparent/Grandchild Contact of C.A.G.*, ¶ 17, particularly in the situation at hand wherein her mother was murdered at the hands of her natural father, who is now her adoptive brother. The Uhrichs, since shortly after Rozlyn's murder, have

11

facilitated A.L.U. having contact with Tyler, who has no parental rights after he abandoned A.L.U. and murdered her mother, leaving their stated belief A.L.U. should have no contact with Sharline because she is "toxic, selfish and rude" to ring a bit hollow. While the Uhrichs have occasionally allowed A.L.U. to have visits with Rozlyn's sisters, Sharline remains the strongest link to Rozlyn and there is no guarantee the Uhrichs will continue to allow such visits in the future.

¶19 The GAL report perhaps put it best: "[t]here was so much conflict between the parties and in the center of it all was an innocent little girl." It is understandable the Uhrichs and Sharline desire little to do with one another between Ashley's affair with Sharline's then-husband and Tyler's murder of Rozlyn, but the grandparent visitation statutes are concerned with the best interests of the child. They are not a vehicle for the Uhrichs, as adoptive parents of A.L.U., to avoid uncomfortable contact with Sharline. The District Court correctly determined the presumption in favor of the Uhrichs' wishes as fit parents was rebutted under the facts of this case as those objections stemmed from unreliable and irrelevant testimony based on obvious personal grudges. A.L.U.'s best interests are served by maintaining a connection with her maternal grandmother, whom she had been seeing weekly prior to Rozlyn's murder and in the months after until the Uhrichs adopted her and abruptly cut off all contact. Though it did not deny all contact as the Uhrichs wished, the District Court did recognize their rights as parents and made Sharline's visitation limited and supervised. While the Uhrichs assert the District Court improperly substituted its judgment for theirs, on appeal they are essentially asking this Court to agree with their interpretation of the facts and substitute our judgment for that of the District Court. As the

District Court was correct in determining, by clear and convincing evidence, the presumption in favor of the Uhrichs had been rebutted and contact with Sharline is in A.L.U.'s best interest, we decline to do so. In addition, the visitation schedule set forth by the District Court—greatly modified from what Sharline initially proposed—was eminently reasonable.

## CONCLUSION

¶20 The District Court properly interpreted § 40-9-102(4), MCA, and correctly determined the presumption in favor of the Uhrichs' wishes for A.L.U. to have no contact with Sharline had been rebutted and some limited contact with Sharline was in A.L.U.'s best interest.

¶21 Affirmed.

/S/ INGRID GUSTAFSON

We Concur:

/S/ CORY J. SWANSON
/S/ LAURIE McKINNON
/S/ JAMES JEREMIAH SHEA
/S/ JIM RICE